**STATE of Missouri,
Plaintiff-Respondent,**

v.

**Judy HENDERSON,
Defendant-Appellant.**

**No. 13157.**

Missouri Court of Appeals,
Southern District,
Division One.

Feb. 3, 1984.

Motion for Rehearing or to Transfer
Denied Feb. 29, 1984.

Application to Transfer Denied
April 16, 1984.

Frank V. DiMaggio, Asst. Public Defender, Springfield, for defendant-appellant.

John Ashcroft, Atty. Gen., Kristie Green, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

FLANIGAN, Presiding Judge.

A jury found defendant Judy Henderson guilty of capital murder, § 565.011, RSMo 1978, and she was sentenced to imprisonment for life without eligibility for probation or parole for 50 years. Defendant appeals. Each of defendant's three points challenges the admissibility of certain evidence introduced by the state over defendant's objection. Defendant does not challenge the sufficiency of the evidence to support the verdict.

The victim was Harry Klein and the offense and death occurred on July 13, 1981, near Springfield, Missouri. Klein, a Springfield jeweler, was previously acquainted with defendant and it is a reasonable inference that there was a romantic involvement, at least from Klein's standpoint. Klein and defendant, driving separate cars, had dinner together during the early evening of July 13, 1981. Defendant's "boy friend," Greg Cruzen, concealed himself behind the front seat of defendant's car. Leaving the restaurant in their separate cars, defendant and Klein drove to a rural area where Klein was fatally shot.

The state produced no eyewitnesses to the murder. There was, however, ample evidence to support a finding by the jury that Klein was murdered by defendant, acting alone or with Cruzen, for the purpose of obtaining a ring and other items of jewelry which Klein had on his person. Each item of jewelry had traits which made it identifiable.

State's witness Donald Littlejohn, a bondsman, testified that "shortly after" 11:00 p.m. on the night of the murder Cruzen, who was a business associate of Littlejohn, came to the latter's office in Spring-field. Defendant accompanied Cruzen to Littlejohn's office. She stayed in the car while Littlejohn and Cruzen talked for a few minutes and then she joined them. Defendant had sustained a bullet wound herself at the time of the murder.

Littlejohn testified that defendant and Cruzen told him that they had murdered Klein and that they had removed Klein's jewelry from his body. They wanted Littlejohn's help in moving Klein's body, a request which Littlejohn said he rejected. They were also interested in Littlejohn's appraisal of the severity of defendant's wound which apparently was minor. Cruzen told Littlejohn that he and defendant were going to St. Louis where they would see a doctor. Littlejohn also testified that he knew that Cruzen and defendant intended to go on to Alaska.

On July 19, 1981, defendant and Cruzen flew to Fairbanks, Alaska, and remained in that state until they were arrested by the Fairbanks police on December 18, 1981. Shortly after their arrival in Alaska defendant and Cruzen received a package which they themselves had mailed from Missouri and which contained Klein's bloodstained jewelry. After cleaning the jewelry, defendant and Cruzen sold one item, a money clip, gave away another item, a watch, and were disappointed to learn that a stone in a ring which they thought was an expensive diamond was in fact an imitation diamond.

Defendant asserts that the trial court erred in permitting the state to introduce, over defendant's objection, these three items of evidence: (1) testimony of state's witness Devon Sherwood, an attorney, with respect to a conversation which Sherwood had with Littlejohn on July 15, 1981, at Springfield; (2) testimony of state's witness Loretta Hudspeth concerning a statement made by Cruzen at Fairbanks, Alaska, in late July 1981, in the presence of defendant, Chuck Schumann, and the witness; (3) testimony of state's witness Paul Keller, a detective with the Fairbanks Police Department, concerning $30,000 worth

of "quaaludes" which the witness had discovered during the course of the arrest of defendant and Cruzen in Fairbanks on December 18, 1981.

Defendant's first point is that the testimony of attorney Sherwood, with regard to the contents of the Littlejohn-Sherwood conversation on July 15, 1981, was inadmissible because it was "hearsay, was repetitive of Littlejohn's prior testimony, was self-serving, and had no probative value."

Through several witnesses the state showed that defendant was with Klein during the hours immediately preceding the murder. The testimony of other witnesses showed defendant's flight to St. Louis and Alaska and her receipt and disposition of the bloodstained jewelry. Littlejohn, however, was perhaps the state's principal witness for it was he who recounted the incriminating statements which Cruzen and defendant made to him on the night of the murder.

Defendant did not testify. After the state rested, defendant offered witnesses whose testimony tended to implicate Littlejohn in the murder. Defense witness Ricky Choate, a convict who had shared a cell with Cruzen following the murder, testified that in August of 1981 Littlejohn showed Choate some diamond rings which Littlejohn said he "got from the Klein killing." Choate testified that Littlejohn told Choate that Littlejohn "had a guy from St. Louis kill Klein."

Earlier, during the direct examination of Littlejohn by the prosecutor, Littlejohn testified that he did not inform law enforcement authorities of the Littlejohn-Cruzen-defendant conversation until May, 1982. Although Littlejohn had talked to law officers prior to that time, he had not informed them of that conversation "because of the nature of my business and secondly because of my friendship to Greg Cruzen."

Without objection, Littlejohn testified as follows: "When Klein's body was discovered I waited one day after I had pondered over this and then I contacted my attorney, Devon Sherwood, here in Springfield and told him I needed to talk to him and told him I knew who I thought had killed Klein. I went to see Sherwood and I told him about this particular incident. I asked Sherwood if it was necessary that I come forward and disclose the information that I knew."

Littlejohn also testified that he had an understanding with the prosecutor that "because of my not disclosing as to who I knew had committed the crime I would not be charged with any crime as far as knowing about it—that's in exchange for my testifying and coming forward."

During lengthy cross-examination by defense counsel, Littlejohn testified that in November 1981 he told detectives that Cruzen had telephoned Littlejohn six times from St. Louis on the three days immediately following the murder. Littlejohn said, "The officers told me that they heard there was a contract out on Cruzen by me and that is that I was going to kill Cruzen. I said I did not have a contract on Cruzen and if it came to killing him I was capable of doing it myself." Littlejohn denied showing Choate jewelry and asking him to sell it. He denied that he told Choate that "I hired a guy from St. Louis to kill Klein." He also denied other portions of Choate's testimony which implicated Littlejohn in the Klein killing.

Also on cross-examination Littlejohn testified that he told attorney Sherwood that he, Littlejohn, was not involved in the murder. Littlejohn said that Sherwood advised him that he did not have "to come forward" with the information which defendant and Cruzen had given him with regard to their participation in the murder. Also on cross-examination Littlejohn testified that he had been interviewed, by detectives investigating the Klein murder, on August 3, 1981, and November 9, 1981, but he did not tell them at that time of his July 13, 1981, conversation with Cruzen and defendant. He testified that he did not report that

conversation to the authorities after defendant and Cruzen left his home. In answering a series of individual questions,[1] he testified that he did not report the matter to the authorities on the next day or the following day or during the month of July or August or September or October or December 1981.

Attorney Sherwood was the next witness called by the state. Before Sherwood testified defense counsel objected to his testimony with regard to the Littlejohn-Sherwood conversation "for the reason that we believe that to be self-serving as to Littlejohn's testimony,—self-serving and trying to bolster his own witness by his own testimony." The objection was overruled.

On direct examination Sherwood testified that Littlejohn was his client and that two days after the Klein murder Littlejohn told the witness that Littlejohn had something serious that he needed to discuss. "I asked [Littlejohn] what the general nature of it was and [Littlejohn] told me at that time that Mr. Cruzen and Judy Henderson had come to him the night of the killing of Mr. Klein and had told him that they did it."

Sherwood also testified that based on legal research he later advised Littlejohn that "as a matter of good citizenship" perhaps Littlejohn should inform the authorities but that Littlejohn "was not, himself, guilty of any crime by not voluntarily going forward without inquiry having been made of him. But if inquiry was made of him, then he would have to make the statements as he made them to me."

As the foregoing demonstrates, this was the procedural situation when Sherwood testified: Littlejohn had testified, during the state's case, with regard to the Littlejohn-Cruzen-defendant conversation of July 13, and with regard to the Littlejohn-Sherwood conversation of July 15. During cross-examination Littlejohn was asked if he had made prior statements to Ricky Choate which were inconsistent with his trial testimony and Littlejohn had denied making them. The cross-examination of Littlejohn, as set forth in footnote 1, unmistakably constituted a charge that Littlejohn's trial testimony was recently fabricated. Sherwood's testimony with regard to the Littlejohn-Sherwood conversation

1. During cross-examination Littlejohn testified that on the morning following his conversation with defendant and Cruzen, Littlejohn learned "that Klein was really dead." The following interrogation by defense counsel then took place:

"Q. When you learned that I suppose, sir, that's when you picked up the phone and called the Sheriff and said, 'I have some information from people who killed Mr. Klein', is that when you called the Sheriff?
"A. No, sir.
"Q. Okay. Well, then, I suppose you thought about it another day, or thought about it some more, anyway, is that true?
"A. Uh-huh.
"Q. Thought about it some more that day?
"A. Uh-huh.
"Q. So that would have been the 14th. I suppose, then, it was the 15th of July when you decided that you had this information, and you had seen more about it on radio and television by then, hadn't you?
"A. Yes, sir.
"Q. I suppose, then, it was the 15th of July, the next day, when you called the Sheriff and said, 'Hey, I know who the killers are', did you call them then?
"A. I did not.

"Q. Let's jump up a little. Did you call them at all in the month of July?
"A. No, sir.
"Q. In the month of August?
"A. No, sir.
"Q. In the month of September of '81?
"A. No, sir.
"Q. In the month of October of '81?
"A. No, sir.
"Q. The month of December of '81?
"A. No, sir.
"Q. To make a long story short, up until what month in the following year, of '82, did you finally come up with this startling information?
"A. A little over three weeks ago, sir.
"Q. All right. That would have been some time in June of '82, isn't that true?
"A. I can't remember.
"Q. Three weeks ago. You know what date today is?
"A. 22nd.
"Q. Okay. So about three weeks ago would have been the latter part of last month or the first part of this month, is that a fair statement?
"A. Approximately."

served to bolster Littlejohn's testimony and to rehabilitate Littlejohn. During the defendant's case, Ricky Choate testified to statements allegedly made by Littlejohn in August 1981 which were inconsistent with Littlejohn's trial testimony but which were made after the date of the Littlejohn-Sherwood conversation.

Sherwood's testimony, accordingly, may be viewed from two aspects: (1) it was testimony of a prior consistent statement tending to rehabilitate Littlejohn from a charge of recent fabrication and (2) it was testimony of a prior consistent statement tending to rebut the impeaching effect of Choate's testimony concerning the August statement which was inconsistent with Littlejohn's trial testimony. Choate, however, had not yet testified at the time Sherwood testified.

At the time the Sherwood testimony was introduced defendant objected to it on the grounds that it was "self-serving as to Littlejohn's testimony," and "trying to bolster his witness by his own testimony." In this court the defendant makes the additional objection that Sherwood's testimony was hearsay. Generally a ground for objection, not voiced in the trial court, will not be entertained on appeal. This court, for reasons which follow, holds that the Sherwood testimony was properly received and that is so even if hearsay had been included in the grounds presented to the trial court.

■ "Hearsay evidence is in-court testimony of an extrajudicial statement offered to prove the truth of the matters asserted therein, resting for its value upon the credibility of the out-of-court declarant." *State v. Harris*, 620 S.W.2d 349, 355 (Mo. banc 1981). Similarly, the Federal Rules of Evidence define hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). The rationale of the hearsay rule is that when a statement is offered as evidence of the truth of the fact asserted in it, the credit of the asserter becomes the basis of the inference, and therefore the assertion can be received only when made upon the witness stand, subject to cross-examination. If, however, an extrajudicial statement is offered without reference to the truth of the matter asserted, the hearsay rule does not apply. The evidence may or may not be received, depending on whether it has any relevancy in the case. *State v. Trotter*, 536 S.W.2d 877, 879 (Mo.App.1976), quoting from Wigmore on Evidence.

Simplified, Littlejohn's testimony was: "Defendant Henderson told me she murdered Klein." Defendant, understandably, made no objection to that testimony because it was admissible "as an exception to the hearsay rule because [it] constitute admissions of [defendant]." *State v. Engleman*, 634 S.W.2d 466, 480[21] (Mo.1982). "Admissions by a party opponent are admissible either as an exception to the hearsay rule or because such admissions are not considered hearsay." *State v. Reagan*, 654 S.W.2d 636, 640 (Mo.App.1983).

Simplified, Sherwood's testimony was: "Littlejohn told me on July 15, 1981, that defendant Henderson told him [Littlejohn] that she murdered Klein." At the time Sherwood testified, the defendant had not yet proved, through Choate, that Littlejohn had made, in August, statements inconsistent with Littlejohn's trial testimony. On the other hand, the defendant's counsel had already cross-examined Littlejohn and, through the interrogation set forth in footnote 1, impliedly charged that Littlejohn's testimony was recently fabricated.

■ The admissions made by defendant [and Cruzen] to Littlejohn were admissible, either as viewed as exceptions to the hearsay rule or as non-hearsay. The vital issue is whether Sherwood could testify with regard to the contents of the July 15 statement of Littlejohn to Sherwood which in-

cluded those admissions.[2] In essence, the inquiry into the admissibility of Sherwood's testimony would be the same if Littlejohn had witnessed the killing and had said to Sherwood, "I saw defendant murder Klein."

Rule 801(d) of the Federal Rules of Evidence reads, in pertinent part: "A statement is not hearsay if ... (1) the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement; and the statement is ... (B) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication...." Rule 801 also defines a "declarant" as "a person who makes a statement."

Under the foregoing rule Sherwood's testimony was not hearsay because Littlejohn, the declarant, testified at the trial and was subject to cross-examination (which he underwent) concerning the statement, and the statement (Littlejohn's statement to Sherwood) was consistent with Littlejohn's testimony and was offered to rebut an express or implied charge against Littlejohn of recent fabrication.

Federal cases upholding the admissibility of the Sherwood testimony under the "recent fabrication" provision of Rule 801(d)(1)(B) include *United States v. Hamilton*, 689 F.2d 1262 (6th Cir.1982); *United States v. Parry*, 649 F.2d 292 (5th Cir. 1981); *United States v. Patterson*, 644 F.2d 890 (1st Cir.1981); *United States v. Provenzano*, 620 F.2d 985 (3rd Cir.1980); *United States v. Knuckles*, 581 F.2d 305 (2nd Cir.1978); *United States v. Zuniga-Lara*, 570 F.2d 1286 (5th Cir.1978); and *United States v. Lombardi*, 550 F.2d 827 (2nd Cir.1977).

It is pointed out in *United States v. West*, 670 F.2d 675 (7th Cir.1982), that Rule 801(d)(1)(B) itself provides that a prior consistent statement, if offered to rebut a

charge of recent fabrication, is admissible and is not hearsay. The court said, at p. 686:

"The rule sets forth four requirements of admissibility: (1) the out-of-court declarant must testify at trial; (2) the declarant must be subject to cross-examination concerning the out-of-court declaration; (3) the out-of-court declaration must be consistent with the declarant's trial testimony; and (4) the evidence must be offered to rebut a charge of recent fabrication."

Most of the federal courts of appeals hold that Rule 801(d)(1)(B) rebuttal statements may be admitted through the testimony of a third party (here Sherwood) and not only through the impeached declarant (here Littlejohn). See *United States v. West*, supra, 670 F.2d at 687, citing cases from the 2nd, 3rd, 4th, 5th, 8th and 9th circuits so holding but disagreeing with them on that point.

Two federal cases illustrating the admissibility of Rule 801(d)(1)(B) rebuttal statements are *United States v. Patterson*, supra, and *United States v. Majors*, 584 F.2d 110 (5th Cir.1978), each remarkably similar to the facts at bar.

In *United States v. Patterson*, supra, a government witness was one Mancone, whose testimony was damaging to the defendant. The defendant undertook to impeach Mancone by suggesting that his testimony was recently fabricated. Attorney Gioffre was later called as a government's witness and the attorney was permitted, properly, to testify with regard to a statement which Mancone, his client, had made to him which was consistent with Mancone's trial testimony and which tended to rebut the implied charge of recent fabrication.

In *United States v. Majors*, supra, one Coby, a government witness, testified con-

Fed.R.Evid. 805 reads: "Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule."

For a discussion of that rule and "double hearsay" see *State v. Reagan*, 654 S.W.2d 636, 639–640 (Mo.App.1983).

cerning the defendant's participation in a narcotics transaction and was discredited on cross-examination. The trial court properly permitted Coby's trial testimony to be "substantiated by the testimony of his former attorney to the effect that Coby's version of the transaction, given to this attorney shortly after he was arrested, was entirely consistent with the testimony [Coby] had given on the witness stand." The court pointed out that the evidence was admissible under Rule 801(d)(1)(B) and that "[i]t was not tendered nor admitted as the otherwise hearsay declaration of a co-conspirator."

■ Rule 801(d)(1)(B) statements are substantive evidence, *United States v. Parry,* supra; *United States v. Provenzano,* supra; *United States v. Herring,* 582 F.2d 535 (10th Cir.1978); *United States v. Zuniga-Lara,* supra; as distinguished from evidence to be considered only for its rehabilitating effect.

■ A Rule 801(d)(1)(B) rebuttal statement is admissible whether or not it was made prior to forming a motive to falsify. *United States v. Hamilton,* supra; *United States v. Parry,* supra. The operation of the rule is not limited to situations where the declarant has been impeached by a prior inconsistent statement, *United States v. Baron,* 602 F.2d 1248 (7th Cir.1979), and if a prior inconsistent statement has been used to impeach the witness, the Rule 801(d)(1)(B) rebuttal statement is admissible even if it was made thereafter. *United States v. Rios,* 611 F.2d 1335, 1349[24] (10th Cir.1979).

The foregoing federal cases and other authorities,[3] if followed, would invalidate defendant's first point and make it unnecessary to consider whether or not the Sherwood testimony was admissible on the inde-pendent ground that it was a prior consistent statement offered to counter proof of a prior inconsistent statement.

There appear to be few Missouri cases discussing the admissibility of a statement offered in rebuttal to a charge of recent fabrication. They include *State v. Richardson,* 349 Mo. 1103, 163 S.W.2d 956 (1942); *State v. Higgs,* 216 Mo.App. 202, 259 S.W. 454 (1924); *Wills v. Sullivan,* 211 Mo.App. 318, 242 S.W. 180 (1922); *State v. Taylor,* 134 Mo. 109, 35 S.W. 92 (1896).

In *State v. Richardson,* supra, the mother of a teenage rape victim was permitted to testify that the victim complained to her about the rape shortly after it occurred. The court pointed out that evidence of fresh complaints of a rape victim is an exception to the hearsay rule. The court also said that another reason for the admissibility of the evidence there was that the victim had been impeached by a prior inconsistent statement and the testimony was admissible "to sustain her against the charge of 'recent contrivance'—that is, of fabricating the trial charge against her father, with the aid of her mother."

In *State v. Higgs,* supra, Lamb, a state's witness, identified the defendant as a robber. On cross-examination Lamb testified that he had told one Brazeal that he did not know the robber. The state was permitted to introduce evidence from witnesses Wilhoit and Sampey to the effect that on the afternoon of the robbery Lamb gave each witness the name of the robber. Such testimony was admissible to rebut a charge of "recent fabrication." The court said, at p. 457:

" 'The principal exception to the general rule of evidence that the statements of a witness out of court are inadmissible is the one mentioned by Mr. Justice Story that,

---

**3.** The admissibility of a prior consistent statement of a witness to counter a charge of recent fabrication is discussed in 81 Am.Jur.2d Witnesses § 651, p. 654; 75 A.L.R.2d 909, 939 § 26; 98 C.J.S. Witnesses § 624, p. 637; Wigmore on Evidence, Chad.Rev., Vol. IV, § 1129, p. 270–272; Wharton's Criminal Evidence, 13th Ed., Vol. 2, § 500, p. 483. See also 32B Am.Jur.2d, Fed.R.Evid. § 208, pp. 588–590.

where the testimony of the witness is assailed as a fabrication of recent date, or a complaint recently made, in order to repel such imputation, proof of the antecedent declarations of the witness consistent with his testimony may be received. *Ellicott v. Pearl* [35 U.S. 412], 10 Pet. 412, 9 L.Ed. 475.' 41 L.R.A. (N.S.) 890."

In *Wills v. Sullivan*, supra, a civil action for damages for assault, the defendant introduced evidence concerning prior inconsistent statements of the plaintiff and also testimony of one Thompson to the effect that the plaintiff, during numerous conversations with Thompson, had never mentioned ill treatment by the defendant. The plaintiff then introduced testimony that he complained to other witnesses of the alleged assaults immediately after he left the defendant's home. The latter testimony was admissible both as prior consistent statements and to rebut the charge of recent fabrication.

In *State v. Taylor*, supra, the court, in dictum, cited with approval a textwriter to the effect that a prior consistent statement is admissible to rebut impeaching evidence which "goes to charge the witness of a recent fabrication under his testimony."

The foregoing Missouri cases, in general, adopt the rationale of Rule 801(d)(1)(B). It may be debatable whether their vitality has been weakened by the following dictum found in *Nielsen v. Dierking*, 418 S.W.2d 146 (Mo.1967), at p. 152:

"More recent cases in Missouri have made no reference to the question of charges of recent fabrication or improper motives and have predicated admissibility of prior consistent statements following proof of impeachment on whether the statement was prior to or subsequent to the impeaching statement."

Was the Sherwood testimony admissible as a prior consistent statement of Littlejohn tending to rebut the impeaching effect of Choate's testimony concerning the August statement which was inconsistent with Littlejohn's trial testimony?

A leading Missouri case dealing with the admissibility of prior consistent statements of a witness is *McElhattan v. St. Louis Public Service Company*, 309 S.W.2d 591, 594–595 (Mo.1958). There the principles set forth in the following four paragraphs are stated:

When a witness has merely testified on direct examination, without any impeachment, proof of consistent statements is valueless. The witness is not helped by such proof. Although his story may be untrustworthy or improbable, it is not made more probable or trustworthy by any number of repetitions of it. Such evidence is ordinarily irrelevant, cumbersome to the trial, and hearsay, and the courts generally reject it.

Where, however, a witness is impeached by proof of variant acts or statements, relevant evidence of witness's prior statements consistent with his trial testimony is admissible for the purpose of rehabilitation. Before this exception to the general rule of inadmissibility comes into play, it is essential that the witness has been impeached *by proof* of his statements inconsistent with its present testimony, that is, "that evidence has been introduced tending to establish statements made by the witness, which statements were inconsistent with his testimony at the trial."

If a witness on cross-examination *admits* he made the inconsistent statement, proof of the making thereof is, of course, supplied by the witness' own testimony, and the witness stands impeached; but if the witness *denies* making the statement, or says he does not remember making it, the cross-examiner, at this point, merely has laid the foundation for impeachment which may be consummated by the introduction of evidence tending to show the witness had actually made the impeaching inconsistent statement.

Where a witness, who testifies at the trial, is asked on cross-examination whether he has previously made an inconsistent statement and he denies doing so, it is premature for the party sponsoring that

witness to offer evidence of a prior consistent statement so long as there has not yet been proof of a prior inconsistent statement.

In *Nielsen v. Dierking,* supra, 418 S.W.2d at 149, the court said the rule in Missouri is that when a witness has been impeached by *proof* of his statements inconsistent with his trial testimony, prior consistent statements are admissible into evidence for the purpose of rehabilitation if, and only if, the prior consistent rehabilitating statement was made prior to the impeaching statement.

Application of the foregoing principles to the case at bar discloses that the trial court's ruling with respect to the admissibility of the Sherwood testimony was premature if that ruling was based on the theory that the Sherwood testimony qualified as a prior consistent statement of Littlejohn. This is so because Littlejohn, on cross-examination, denied making the August 1981 statements which Choate, testifying later as a defense witness, attributed to him. Thus when the Sherwood testimony was first offered, there was no proof of prior statements of Littlejohn inconsistent with Littlejohn's trial testimony. It is true that Littlejohn's statement to Sherwood antedated the statement Littlejohn made to Choate in August 1981, but Choate had not yet testified to its making so there was no proof of the prior inconsistent statement.

Did the testimony of Choate, introduced later in the trial, serve to cure any error in the trial court's ruling on Sherwood's testimony or at least render it non-prejudicial error? An affirmative answer to that inquiry may be found in *State v. Maxwell,* 502 S.W.2d 382 (Mo.App.1973). In that case a robbery took place on May 26, 1971. Woodard, the robbery victim, testified as a state's witness. On cross-examination Woodard admitted that two investigators attempted to interview him on October 11, 1971, but he denied telling them anything. The next witness for the state was officer

Schulze who testified, over defendant's objection, concerning statements made by Woodard to Schulze on the day of the robbery which were consistent with Woodard's trial testimony. Later in the trial, during presentation of the defendant's case, the defendant introduced evidence of statements made by Woodard on October 11, 1971, which conflicted with Woodard's trial testimony.

The court of appeals held that although the trial court erred in admitting the testimony of officer Schulze during the state's case in chief, "such error was not, when viewed in the light of the evidence offered by the appellant for the purpose of impeaching Mr. Woodard by a subsequent statement, prejudicial. . . ." The holding in *Maxwell* is consistent with the principle that the order of proof rests in the discretion of the trial court, and "if from the whole record it appears that the evidence is competent and relevant and otherwise admissible, the order in which it is offered and admitted is generally immaterial." *State v. McBride,* 438 S.W.2d 222, 223 (Mo. 1969). See also *State v. Reagan,* 108 S.W.2d 391, 397[13–14] (Mo.1937).

It is unnecessary to determine whether the reception of the Sherwood testimony was justified on the basis that it was a prior consistent statement to counter a charge of recent fabrication. It is sufficient to hold, as this court does, that the trial court did not commit prejudicial error in admitting the Sherwood testimony as a prior consistent statement tending to rebut the impeaching effect of Choate's testimony of the August 1981 statement which was later introduced by the defense. Defendant's first point has no merit.

■ Defendant's second point is that the trial court erred "by allowing state's witness Loretta Hudspeth to testify as to evidence of another crime for which the defendant was not on trial." The challenged testimony, later set forth, was not objected to nor was there a request by defense

counsel[4] that the testimony be stricken and the jury instructed to disregard it. Defense counsel did move for a mistrial on the ground that the state "has now introduced evidence of another crime for which the accused is not on trial by saying they were trying to cash some jewelry and hide the money from the Internal Revenue Service.... It's improper for a witness to mention another crime for which the accused is not on trial."

Loretta Hudspeth, a state's witness, shared an apartment in Fairbanks, Alaska, with Lee O'Kelly. On July 19, 1981, the witness received a telephone call to the effect that defendant and Cruzen were arriving in Fairbanks that day. The witness and O'Kelly met defendant and Cruzen at the airport and for the next three weeks the four of them shared the apartment. The witness was told by defendant that she and Cruzen "had witnessed a killing and that a hit man had been sent after them.... The Mafia was looking for them." They were concerned about receiving a package in the mail which contained items of jewelry. They first told the witness that the jewelry had been "taken by Greg as a commission on a real estate exchange."

The witness saw defendant's wound and defendant told the witness, "You remember I told you we had seen somebody get killed and the bullet went through the man and hit me." About July 25 the package containing Klein's jewelry arrived. Defendant opened the jewelry in the presence of the witness. It was bloodstained and the two women washed it.

Significantly the witness testified that later she and defendant were in the restroom of a lounge and Judy told the witness, "I set [Klein] up and killed him. I shot him."

The witness also testified that she accompanied Cruzen and defendant to the office of Chuck Schumann for the purpose of selling Klein's wristwatch and the other jewelry.

During direct examination by the prosecutor the challenged testimony occurred:

"Q. And what do you recall the conversation being as far as Greg and Judy, what they were saying about the watch specifically?

"A. Well, Greg was doing most of the talking on this, and he was telling that he had taken this jewelry in a real estate commission that he had opted to take the jewelry rather than cash, and they were laughing about the Internal Revenue Service, you know, what you could do, and he didn't know about—"

Although Schumann may have believed that the jewelry was taken as a real estate commission, it was clear to the jury, from the testimony of witness Hudspeth, that such was not the situation and that Cruzen was lying to Schumann. The fact was that the jewelry had been taken from the body of the murder victim and the jury so understood from the overall tenor of the witness's testimony. There was in fact no proof that defendant, or even Cruzen, had committed a federal offense by taking a real estate commission in jewelry because the Hudspeth testimony made it clear there was no real estate transaction at all.

If an objection had been made in the trial court, on the ground asserted in defendant's brief, it would have lacked a factual foundation. The brief makes no complaint of the failure of the trial court to declare a mistrial and under the circumstances it is clear that the motion for mistrial was properly denied. Defendant's second point has no merit.

■ Defendant's third point is that the trial court erred "by allowing state's witness Paul Keller to testify as to evidence of another crime for which the defendant was not on trial, thereby depriving defendant of her right to be tried only for the offense for which she was charged."

---

4. Present counsel did not represent defendant in    the trial court.

Paul Keller, a state's witness, was a detective with the Fairbanks police. On December 18, 1981, Keller and other officers had search warrants for the search of Apartment M–9 where Cruzen and defendant had been staying. The officers also had arrest warrants for defendant and Cruzen for capital murder. The officers went to Apartment M–9 but no one was there and the apartment showed evidence of having been recently vacated.

At 7:00 p.m. the officers went to an apartment at 2015 Bridgewater occupied by Linda and Art Farmer, friends of defendant and Cruzen. When the officers knocked on the door of that apartment, defendant attempted to hide herself in a bedroom and Cruzen barricaded himself inside the attached garage. Defendant and Cruzen were taken to the police station.

Keller returned to the Farmer apartment with a search warrant. There Keller and the other officers "searched the whole house from the garage to the back bedrooms and I seized some items." During direct examination of Keller by the prosecutor, the following challenged testimony occurred:

"Q. While at that particular location, Detective Keller, did you have occasion to take anything else into your possession?

"A. That's correct. We also received—in this area was a black bag that had approximately $30,000.00 worth of quaaludes."

At that point defense counsel, outside the hearing of the jury, moved for a mistrial. Counsel stated that "we have had police reports for months in which the police indicated they found some quaaludes, an illegal narcotic drug, in the possession of defendant. I am sure [the prosecutor] in accordance with [the court's] instruction told these officers not to mention the drugs. These are evidence of another crime for which defendant is not on trial. The officer has inadvertently or intentionally disobeyed those orders."

A protracted conference took place at the bench and in chambers concerning the incident. Witness Keller was interviewed by the court and counsel out of the hearing of the jury. The witness said that the prosecutor had told him not to mention quaaludes "unless the prosecutor or defense counsel or the judge asked me about them. With regard to why I mentioned it today when [the prosecutor] did not ask me about them, it was the only other thing of significance at that particular area ... I am not sure still what response he was looking for."

It appears that the testimony was volunteered innocently by the witness and defense counsel conceded to the trial court that the prosecutor "did not know what was coming out; [the prosecutor] instructed him and this is something this officer just blurted out."

The "black bag" containing the quaaludes was in the Farmer garage. There was no direct evidence connecting defendant with the black bag or its contents.

The challenged testimony should not have been admitted and indeed the trial court ordered it stricken. In the trial court defense counsel did not ask the court to instruct the jury to disregard the evidence, although the court did so. The only relief requested was that of a mistrial and the trial court denied that request. The contention here, as framed in defendant's third point, does not specifically complain of the trial court's ruling on the motion for mistrial but, even if the point had been drafted to preserve that complaint, this court finds no prejudicial error.

■ As stated in *State v. Gilbert*, 636 S.W.2d 940 (Mo. banc 1982), where a somewhat similar situation arose, the decision to grant a mistrial on mention of defendant's prior criminal activity rests in the trial court's sound discretion. Mistrial is a drastic remedy, to be granted only with extreme caution and in extraordinary circumstances. The following language, found in

*Gilbert* at p. 943, is applicable here: "In this case, the trial court employed appropriate curative measures short of declaring a mistrial. Further, it is significant that the objectionable portion of the witness' answer was not only unresponsive to the prosecutor's question but did not directly refer to defendant's involvement in other crimes.... In light of these facts, we cannot say the trial court abused its discretion in refusing to declare a mistrial."

Defendant's third point has no merit.

The judgment is affirmed.

TITUS and CROW, JJ., concur.

GREENE, C.J., disqualified.