STATE of Missouri, Respondent,

v.

Ray Lloyd BIBB, Jr., Appellant.

No. 66026.

Supreme Court of Missouri,
En Banc.

Dec. 17, 1985.

Gary L. Robbins, Public Defender, Lance R. Drury, Asst. Public Defender, Jackson, for appellant.

William L. Webster, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for respondent.

DONNELLY, Judge.

On January 20, 1984, appellant Ray Lloyd Bibb, Jr. entered pleas of guilty to charges of armed robbery, armed criminal action and capital murder arising from the killing of Kenneth Wood on November 24, 1983. This appeal is from imposition *by the trial judge* of a sentence of death on the capital murder charge and requires construction and application of § 565.006, RSMo (Supp.1982 and Cum.Supp.1983) (Repealed by Laws of 1983 and effective until October 1, 1984), as it read when the offense was committed:

    1.  At the conclusion of all trials upon an indictment or information for capital murder heard by a jury, and after argument of counsel and proper charge from the court, the jury shall retire to consider a verdict of guilty or not guilty without any consideration of punishment. In nonjury capital murder cases, the court shall likewise first consider a finding of guilty or not guilty without any consideration of punishment. In each jury capital murder case, the court shall not give instructions on any lesser included offense which could not be supported by the evidence presented in the case.

    2.  Where the jury or judge returns a verdict or finding of guilty as provided in subsection 1 of this section, the court shall resume the trial and conduct a presentence hearing before the jury or judge, at which time the only issue shall be the determination of the punishment to be imposed. In such hearing, subject to the laws of evidence, the jury or judge shall hear additional evidence in extenuation, mitigation, and aggravation of punishment, including the record of any prior criminal convictions and pleas of guilty, or pleas of nolo contendere of the defendant, or the absence of any such prior criminal convictions and pleas. Only such evidence in aggravation as the prosecution has made known to the defendant prior to his trial shall be admissible. The jury or judge shall also hear argument by the defendant or his counsel and the prosecuting attorney regarding the punishment to be imposed. * * *

In capital murder cases in which the death penalty may be imposed by a jury or judge sitting without a jury, the additional procedure provided in section 565.-012 shall be followed. The jury, or the judge in cases tried by a judge, shall fix a sentence within the limits prescribed by law. The judge shall impose the sentence fixed by the jury or judge. If the jury cannot, within a reasonable time, agree to the punishment, the judge shall impose sentence within the limits of the law; except that, the judge shall in no instance impose the death penalty when, in cases tried by a jury, the jury cannot agree upon the punishment.

    3.  If the trial court is reversed on appeal because of error only in the presentence hearing, the new trial which may be ordered shall apply only to the issue of punishment.

The determinative issue on this appeal involves trial by the judge and not a jury of the punishment stage required by § 565.-006, *supra.*

We make the following preliminary observations:

(1) In 1932, an accused entered a plea of guilty to a charge of murder in the first degree in the Circuit Court of St. Louis County. A judge of that court accepted the plea and assessed the death penalty. The accused sought to withdraw the plea and his request was refused. On appeal, this Court affirmed. *State v. Kellar,* 332 Mo. 62, 55 S.W.2d 969 (Mo.1932).

(2) In *Proffitt v. Florida,* 428 U.S. 242, 252, 96 S.Ct. 2960, 2966, 49 L.Ed.2d 913 (1976), the United States Supreme Court noted: "This Court has pointed out that jury sentencing in a capital case can perform an important societal function, * * * but it has never suggested that jury sentencing is constitutionally required. And it would appear that judicial sentencing should lead, if anything, to even greater consistency in the imposition at the trial court level of capital punishment, since a trial judge is more experienced in sentencing than a jury, and therefore is better able

to impose sentences similar to those imposed in analogious cases."

(3) Section 565.006, *supra*, expressly requires a bifurcated proceeding—on the issue of guilt (guilt stage) and on the issue of punishment (punishment stage). This bifurcated hearing format was adopted in Missouri "to avoid the imposition of the death penalty in * * * [an] arbitrary and capricious manner * * *." *State v. Royal*, 610 S.W.2d 946, 950 (Mo. banc 1981).

(4) In *Bullington v. Missouri*, 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981), the jury found Bullington guilty (in the guilt stage) and fixed his punishment not at death but at imprisonment for life without eligibility for probation or parole for 50 years. Bullington then moved for a new trial. The trial court, relying on *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), ordered a new trial. Thereafter, the State indicated its intention to again seek the death penalty. The United States Supreme Court held that Bullington could not be sentenced to death after conviction at a new trial without violating the Double Jeopardy Clause. The teaching of *Bullington* is that in Missouri the guilt stage and the punishment stage are discrete; that each is subject to constitutional proscriptions.

(5) Section 565.006, *supra*, expressly permits the *jury or judge* to impose punishment.

On January 16 and 17, 1984, appellant appeared in open court and unexpectedly declared his guilt. On January 20, 1984, appellant was again brought before the court, was advised of his rights and was interrogated extensively by the judge. The judge noted the separation in § 565.006, *supra*, of the guilt stage from the punishment stage and accepted appellant's plea of guilty. He then addressed appellant's right to a trial by jury of the punishment stage.

Appellant first stated a preference that *his* punishment be determined by a jury:

Q Now, do you want a jury to determine the question of whether or not you're guilty?

A No, I'm guilty.

Q Do you want a jury to determine what punishment you should receive for these charges? (PAUSE)

A Yes, Your Honor.

Q You want a jury to determine your punishment, is that correct?

A Yeah.

Q Now, in the, in the first half of the trial the jury would have to, I mean, the State would have to convince 12 people that you were guilty. Do you understand that?

A Yes.

Q But if I accept your Plea of Guilty, that won't be done. Do you understand that?

A Yes.

Q In the second half, the State would have to convince 12 people that you should receive a certain punishment, and I understand that that's what you want to do, is that correct?

A Yes.

\* \* \* \* \* \*

Q Now, let me say to you that what I'm hearing you say is you don't want any trial on the issue of your guilt or innocence?

A No.

Q Is that correct?

A That's right.

Q But the law requires that there be a second half, and you want, of course, to have the second half and you want that by a jury so far as you know, is that correct?

A Yes.

Appellant then indicated a desire that punishment be determined by the judge:

Q All right, Mr. Bibb. I'm going to give you one last opportunity to tell me whether or not you want to plead guilty to the three charges now pending against you. And let me advise you, sir, that once I accept your Plea of Guilty, I will not allow you to withdraw the Plea of Guilty. Do you understand that?

A  Yes, I do.

Q  Having that in mind, sir, do you persist in your Plea of Guilty?

A  Yes. I do.

Q  Do you want me to accept your Plea of Guilty to capital murder, armed robbery and armed criminal action?

A  Yes. I do.

Q  Very well. Mr. Bibbs. in [sic] the case of State of Missouri versus Roy Lloyd Bibb, Jr.—

A  Oh, Your Honor?

Q  Yes?

A  I'd like to say something about you was saying something about the jury and all that?

Q  Right.

A  I'd like to have a Judge decide. I'd like to change that.

Q  Now, that was after you talked to Mr. Robbins?

A  Yes, yes.

Q  Do you understand that you do have the right to a trial by jury on the second issue of punishment?

A  Yes, but I'm, I'm going to let the Judge decide.

Q  Do you understand that, that they only have to convince me, one person, rather than 12 people?

A  Yes.

MR. ROBBINS: Judge, let me explain that I had—that's what he had told me before today, and we went back and said "You can have it either way you want; maybe we ought to think about it, or ..." He said he doesn't want to think, and I explained to him the alternatives. And I said "You make your decision; don't plead guilty and let's think about it" and he said he's pleading guilty and he says he wants the Judge. It's a very momentous decision to make.

Q  (BY THE COURT:) Do you understand how important that decision is?

A  Yes, I do.

Q  I may very well give you the death penalty. Do you understand that?

A  Yes.

Q  Recognizing that I may very well give you the death penalty after hearing the evidence, of course. Do you—

A  Yes.

Q  —still want just a Judge to hear that portion of the trial?

A  Yes, I do.

MR. ROBBINS: Judge, that wouldn't be a final decision. We could change that at a later time. I don't think we'd waive any right on a Judge or jury today. I mean he's made a decision. Either way he goes I believe he could change that before the time came up.

THE COURT: Well, you're probably right on that issue.

MR. ROBBINS: Okay.

*  *  *  *  *  *

THE COURT: We'll set the hearing on the matter of punishment for March 20th, 1984. Pursuant to Section 565.-006, Paragraph 2, I will allow the defendant to reserve the right to request a jury, if he so desires.

There is no subsequent reference to trial by jury in the record on appeal. On April 12 and 14, 1984, the trial judge, without a jury, proceeded to hearing on the punishment stage, and, on May 10, 1984, imposed a sentence of death.

The Constitution of Missouri (Mo.Const. art. I, § 22(a)) reads, in part, as follows:

Section 22(a). That the right of trial by jury as heretofore enjoyed shall remain inviolate; provided * * * that in every criminal case any defendant may, with the assent of the court, waive a jury trial and submit the trial of such case to the court, whose finding shall have the force and effect of a verdict of a jury.

Rule 27.01 reads as follows:

(a) All issues of fact in any criminal case shall be tried by a jury to be selected, summoned and returned in the matter prescribed by law, unless trial by jury be waived as provided in this Rule.

(b) The defendant may, with the assent of the court, waive a trial by jury and submit the trial of any criminal case to

the court, whose findings shall have the force and effect of the verdict of a jury. In felony cases such waiver by the defendant shall be made in open court and entered of record.

In *State v. Taylor*, 391 S.W.2d 835, 836 (Mo.1965), this Court held that "[u]nder the constitution and the rule both accused and court must assent and agree that the issues of fact in a criminal case be determined by the court and not in the traditional form of trial by jury." *Cf.* Fed.R. Crim.P. 23(a),

■■■ On January 20, 1984, when the principals laid aside the matter of punishment, the burden erroneously shifted to appellant to request a jury. Under the Constitution and Rule 27.01(b), a waiver by the accused and an assent of the court must appear from the record with unmistakable clarity. The record on this appeal does not demonstrate such compliance. *Cf. Holmes v. Florida*, 374 So.2d 944 (Fla. 1979).

We do not presume to paint with a broader brush than is necessary. Section 565.-006 as it existed before October 1, 1984, contemplated the right to a trial by jury of the punishment stage. Absent such statutory provision, "there is nothing in the Due Process clause of the Fourteenth Amendment of the United States Constitution, nor in the Constitution and laws of the State of Missouri, which gave appellant the right to have his punishment assessed by the jury." *Payne v. Nash*, 327 F.2d 197, 200 (8th Cir.1964).

The conviction of appellant is affirmed but the cause is remanded for imposition of punishment in a manner consistent with this opinion.

HIGGINS, C.J., and SOMERVILLE, Special Judge, concur.

BILLINGS, J., concurs in result in separate opinion filed.

BLACKMAR, J., concurs in result in separate opinion filed.

RENDLEN, J., concurs in result and in separate concurring in result opinion of BILLINGS, J.

WELLIVER, J., dissents in separate opinion filed.

ROBERTSON, J., not sitting.

BILLINGS, Judge, concurring in result.

I could join an opinion holding the defendant waived jury sentencing by his plea of guilty and affirm the judgment. However, for the reasons assigned in the principal opinion and in recognition that this capital murder case will be subjected to countless judicial reviews in years to come, I concur in the result reached by that opinion.

In response to the dissent of our Brother WELLIVER, I make the following observations: first, it is questionable whether a present majority of this Court would follow *State v. McIlvoy* in a proportionality review situation; second, the defendant has admitted that the killing was his idea and, acting alone, fired the fatal shots; lastly, prosecutors in this State have the authority to decide what charges to bring against which person in multiple defendant criminal acts and judicially approved plea bargaining is simply another facet of such authority. We should not use our statutory grant of proportionality review as a vehicle to circumvent the declared public policy of this State approving the death penalty in certain instances.

BLACKMAR, Judge, concurring in result.

My preference would be to concur in Judge Welliver's eloquent and well documented opinion. I cannot distinguish this case from *State v. McIlvoy*, 629 S.W.2d 333 (Mo. banc 1982). I do have reservations about the last paragraph, because I doubt that the record would support capital murder charges against Cutts or Wagner.

I am disturbed by Judge Billings' statement that "it is questionable whether a present majority of this Court would follow *State v. McIlvoy* in a proportionality review

situation; ..." The statute commands a review of proportionality. The Court is a continuing body and is something other than the sum of its membership. *McIlvoy* is a part of the proportion.

In order that the Court may resolve the case, however, I concur in the result reached in the particular opinion. Although the record persuades me that the trial judge took great pains to advise the defendant that he could have a jury determination of punishment, I believe that it is better to remand with the directions of the principal opinion than to suffer a third submission of the case to this Court.

WELLIVER, Judge, dissenting.

I respectfully dissent.

The principal opinion incorrectly focuses on whether the judge or a jury should have imposed the punishment. Assuming, arguendo, that appellant had a right to a jury determination at his punishment stage, appellant clearly waived any such right. The court asked appellant repeatedly whether he wanted a jury to decide the issue of punishment. Appellant, apparently against the advice of counsel and after strong indications by the judge that he might impose the death penalty, voluntarily choose to have the court decide the issue of punishment. Appellant has not preserved any challenge to the trial court's having determined punishment. In appellant's many assignments of error urged to this Court, he nowhere contends that he did not voluntarily waive any possible right to a jury determination of punishment. Instead, at issue in this case should be whether appellant's death sentence is disporportionate. I believe that his sentence is disproportionate, and I would affirm the conviction but order the case remanded with directions to resentence appellant to life imprisonment without the possibility of probation or parole for 50 years as provided in § 565.008, RSMo 1978 (repealed).

Curtis Cutts and Melissa Wagner lived across the street from appellant, a 23 year-old man. Cutts, a former truck driver, quit his job after becoming dissatisfied with how his employer had reimbursed him for certain services and expenses. In retaliation against his former employer, Cutts recruited appellant and Wagner, his girlfriend, into a scheme to hijack one of his ex-employer's trucks, tie up the driver, and sell the truck cargo to a salvage yard.

The first three attempts of the group ended in failure. During the first attempt, on October 19, 1983, the three managed to capture a truck and tie up and leave the driver by the side of the road. The truck, however, broke down and was abandoned. Their second and third attempts were equally unsuccessful.

Then, at dusk on November 23, 1983, Cutts, Wagner and appellant located a truck driven by Kenneth Wood. They were unable to stop the vehicle by throwing paint filled jars at the windshield of the truck. Next, appellant tried without success to shoot out the truck tires with a gun that he had obtained for that purpose. Cutts took the weapon from appellant and, while driving the car, managed to shoot out one of the tires. As the two vehicles continued north on Interstate 55 in Cape Girardeau County, Cutts blinked the car lights and the truck pulled over onto the shoulder. Cutts stopped the car directly behind the truck, and then with appellant's help pretended to assist Wood in changing the flat tire. Cutts left appellant standing alone behind Wood.

Appellant testified at his plea hearing that when Wood squatted to fix the flat tire, appellant suddenly became afraid that the victim would attack him. Appellant stated that he shot the victim once in the back of the head and thought he had killed the victim. Appellant testified that after the shot Cutts came and helped appellant drag the victim off the side of the road. After dragging the victim into the area beside the road and then returning to the highway shoulder, Cutts told appellant to go back to the body and take any money from the victim's wallet. When appellant returned alone to the body, the victim moved and started to breathe "real hard." Appellant claims that he became excited

when the body moved, because he thought Wood was dead. He fired at the victim again. Appellant said that afterward he ran to the car, put the 9 millimeter gun on the back seat, and then jumped in the truck. Cutts drove the truck, leaving Wagner alone with the gun, the car, and the victim.

On December 1, 1984, appellant turned himself in to the authorities. He confessed to shooting the victim and participating in the hijacking. After confessing to agents of the Federal Bureau of Investigation, he repeatedly confessed to the Cape Girardeau police.

Ignoring the advice of counsel, but following discussions with his family and a priest, appellant pled guilty. When he tendered his plea, appellant admitted that he committed the crime. He told the court he put his fate in God's hands and would not lie. Appellant had not entered into any plea agreement with the prosecutor. Appellant stated that he wanted to make his peace with God and apologized to the victim's family.

The trial judge conducted appellant's sentencing hearing on April 12 and April 14 of 1984. A succession of police officers and prison guards testified for appellant. Joseph Fink, Special Agent for the Federal Bureau of Investigation, testified that appellant turned himself in, voluntarily answered questions, was remorseful, and later helped find the murder weapon. Robert Hull, a City of Jackson police officer, and Robert Clifton, the Chief of Police for the City of Jackson, testified that appellant was always respectful and frequently participated in religious activities. Sergeant Larry Wade of the Jackson Police Department testified that appellant seemed remorseful and sorrowful. Sergeant Wade stated that appellant's Pentecostal faith forbids lying and requires confessing one's sins before being allowed into heaven. Lieutenant John Brown, an eight year veteran on the Cape Girardeau police force, declared that when he received appellant's statement appellant was remorseful and in tears. Appellant provided the Lieutenant with several additions to his confession.

Dr. John Skaggs, Director of Psychological Testing at St. Francis Mental Health Center, testified for appellant. Dr. Skaggs examined appellant at the request of the trial court and diagnosed appellant as suffering from cyclothymic and dependent personality disorders. Dr. Skaggs observed that a person like appellant acts on impulse and when such people are without guidance they become panicky and act on emotion alone. Dr. Skaggs testified that when appellant was standing alone behind Wood, appellant could have suffered from an irrational bout of fear. Further, Dr. Skaggs declared that appellant could have been more panicked while alone in the woods with the victim's body than while standing behind the victim alongside the highway.

Dr. Maria Lyskowski, a staff psychiatrist at St. Francis Mental Health Center, also examined appellant at the request of the court. She testified that while she would use different terminology, her findings were identical to those of Dr. Skaggs. Dr. Lyskowski explained that appellant suffered from multiple learning disabilities and dyslexia and was illiterate with an IQ of 75. She added that appellant had a passive personality disorder with extreme dependence on others and was impulsive and prone to panic. Dr. Lyskowski also had examined Cutts and found him to have an aggressive personality, and it was her opinion that Cutts dominated appellant.

Dr. Lyskowski testified that when appellant fired the first shot he was under "extreme duress." According to Dr. Lyskowski, when appellant fired the later shots he was extremely disturbed and acted out of fear, anxiety, and panic. Dr. Lyskowski stated that appellant's ability to conform his conduct to the law was substantially impaired when he committed the murder. The report submitted to the trial judge by the Missouri Board of Probation and Parole also suggested that appellant did not anticipate the commission of a homicide but acted under the "heat of the situation."

The State called Melissa Wagner to testify at appellant's punishment hearing. Wagner stated that she had pled guilty to murder in the first degree as part of a plea bargain, but that she had not yet been sentenced. State and Federal authorities had agreed not to file any other charges against Wagner if she testified against Cutts and appellant. Wagner asserted that appellant initially left the car without the gun but later returned to the car for the pistol. Wagner said appellant stood alone behind Wood, by the truck, and shot the victim twice. She testified that she only saw appellant drag the body off the shoulder of the road. After seeing appellant drag the body into the forest, Wagner said that she heard three more shots. Wagner further testified that appellant came out of the woods and threw the gun into the car, appellant exclaimed that he had killed the victim because Wood had heard appellant call Cutts by his true name and could identify them. Wagner said Cutts and appellant drove the truck and she met them later.

During cross-examination, Wagner admitted that she loved and continues to love Cutts and that he fathered her child. She said she didn't see Cutts anywhere near appellant when he shot the victim and dragged the body away from the road. She admitted that Cutts was in command, giving orders, planning the hijacking attempts, and paying for their supplies. Wagner admitted that she testified seeking gain and to avoid spending the rest of her life in prison.

The story Wagner told at appellant's sentencing hearing differs from her earlier accounts. At appellant's punishment hearing, Wagner said that *after* appellant shot the victim, he stated that he killed Wood because Wood could identify them. But on January 16, 1984, in a statement made to police, Wagner said that appellant told her *before* Wood was shot that Cutts and appellant were going to kill Wood because Wood could identify them.

Wagner also testified at appellant's punishment hearing that appellant returned to the car for the 9 millimeter pistol used to kill the victim. However, in her December 2, 1983 statement to police and in her own plea hearing testimony, Wagner never mentioned appellant returning to the car for the pistol. Also at her plea hearing, Wagner admitted "I forget things every once in a while."

Finally, at appellant's punishment hearing, Wagner said she never saw Cutts help appellant drag the body away from the road. Cutts himself has admitted to police that he helped appellant carry the victim away from the road.

After reviewing the evidence, the trial judge found the following statutory aggravating circumstances: (1) that appellant "committed the offense of capital murder for himself and others for the purpose of receiving money or any other thing of monetary value;" (2) that appellant committed the offense of capital murder for the purpose of preventing the victim "from testifying in any judicial proceeding."

The trial judge also found the following mitigating circumstances: (1) appellant was 23 years old at the time of the crime; (2) appellant had an IQ of 75; (3) appellant had a learning disability; (4) appellant is a personable, polite young man; (5) appellant is deeply religious; (6) appellant is now remorseful; (7) appellant voluntarily turned himself in and assisted the authorities by giving information against Curtis Cutts and Melissa Wagner; (8) appellant pled guilty.

The trial court imposed the death sentence.

In death penalty cases, the legislature of Missouri has given this Court a special duty to review, scrutinize, and possibly change the sentence of death. § 565.014, RSMo 1978 (now repealed). Our duties under this statutory provision go far beyond those of a reviewing court in other criminal cases.

2. The supreme court of Missouri shall consider the punishment as well as any errors enumerated by way of appeal.

3. With regard to the sentence, the supreme court shall determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and

(2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in section 565.012; and

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

§ 565.014, RSMo 1978.

Appellant maintains, *inter alia*, that his death sentence is disproportionate to the sentence given in similar cases. In this context, the Court must consider whether the sentence imposed is excessive or disproportionate to the penalty assessed in similar cases, considering both the crime and

the defendant. § 565.014.3(3), RSMo 1978. This Court must examine all those capital murder convictions except those where the State waived the death penalty. The majority of cases where the death penalty has been imposed involve a murder for hire,[1] a multiple killing,[2] a vile torturous killing,[3] or a carefully planned killing.[4] These elements, however, are not present in the case at bar. Rather, this case involves a murder committed during the course of a robbery. Prior cases where this Court has affirmed the death penalty, when the murder was committed during a robbery, involve crimes where the murder was either contemplated or expected by the defendant.[5] In *State v. Johns*, 679 S.W.2d 253 (Mo. banc 1984), the defendant killed a 17 year-old gas station attendant during a robbery after bragging before committing the crime that he "never left any witnesses." I question whether appellant's offense is as preplanned and

1. See *State v. Bannister*, 680 S.W.2d 141 (Mo. banc 1984); *State v. Blair*, 638 S.W.2d 739 (Mo. banc 1982).

2. See *State v. Byrd*, 676 S.W.2d 494 (Mo. banc 1984); *State v. Preston*, 673 S.W.2d 1 (Mo. banc 1984); *State v. Laws*, 661 S.W.2d 526 (Mo. banc 1983); *State v. Baskerville*, 616 S.W.2d 839 (Mo. 1981).

3. See *State v. Gilmore*, 681 S.W.2d 934 (Mo. banc 1984); *State v. Battle*, 661 S.W.2d 487 (Mo. banc 1983); *State v. Smith*, 649 S.W.2d 417 (Mo. banc 1983); *State v. Trimble*, 638 S.W.2d 726 (Mo. banc 1982); *State v. Stokes*, 638 S.W.2d 715 (Mo. banc 1982).

4. See *State v. Gilmore*, 681 S.W.2d 934 (Mo. banc 1984); *State v. Bannister*, 680 S.W.2d 141 (Mo. banc 1984); *State v. Byrd*, 676 S.W.2d 494 (Mo. banc 1984); *State v. Lashley*, 667 S.W.2d 712 (Mo. banc 1984); *State v. Griffin*, 662 S.W.2d 854 (Mo. banc 1983); *State v. Laws*, 661 S.W.2d 526 (Mo. banc 1983); *State v. Gilmore*, 661 S.W.2d 519 (Mo. banc 1983); *State v. Gilmore*, 650 S.W.2d 627 (Mo. banc 1983); *State v. Larette*, 648 S.W.2d 96 (Mo. banc 1983); *State v. Blair*, 638 S.W.2d 739 (Mo. banc 1982); *State v. Trimble*, 638 S.W.2d 726 (Mo. banc 1982).

5. See *State v. Nave*, 694 S.W.2d 729 (Mo. banc 1985) (defendant murdered during a robbery, kidnapping, sodomy spree); *State v. Malone*, 694 S.W.2d 723 (Mo. banc (1985) (defendant murdered a cab driver and had previously murdered others); *State v. Kenley*, 693 S.W.2d 79 (Mo. banc 1985) (defendant murdered victim

during armed robbery and kidnapping spree); *State v. Gilmore*, 681 S.W.2d 934 (Mo. banc 1984) (defendant robbed and killed elderly people); *State v. Johns*, 679 S.W.2d 253 (Mo. banc 1984) (defendant killed a gas station attendant during a robbery); *State v. Byrd*, 676 S.W.2d 494 (Mo. banc 1984) (defendant planned a robbery involving multiple murders and carried it out); *State v. Lashley*, 667 S.W.2d 712 (Mo. banc 1984) (defendant waited for the elderly woman who raised him to return to her apartment, he killed her with a frying pan and a knife); *State v. Laws*, 661 S.W.2d 526 (Mo. banc 1983) (defendant was part of a gang which robbed and killed the elderly); *State v. Gilmore*, 661 S.W.2d 519 (Mo. banc 1983) (defendant robbed and killed elderly people); *State v. McDonald*, 661 S.W.2d 497 (Mo. banc 1983) (defendant had attended college, he shot and robbed a police officer, discovering the officer's identity the defendant returned and shot the officer again); *State v. Battle*, 661 S.W.2d 487 (Mo. banc 1983) (defendant entered elderly woman's home, waited for her to return, brutalized her, raped her, stabbed her); *State v. Stokes*, 638 S.W.2d 715 (Mo. banc 1982) (defendant accompanied a woman home, strangled and robbed her); *State v. Baker*, 636 S.W.2d 902 (Mo. banc 1982) (defendant shot, killed, and robbed a policeman). *State v. Newlon*, 627 S.W.2d 606 (Mo. banc 1982) (defendant discussed with his friends the robbery of a store and the killing of the proprietor, the store owner was killed with two deliberate blasts from a shotgun); *State v. Mercer*, 618 S.W.2d 1 (Mo. banc 1981) (defendant with others raped, beat, and killed a woman).

premeditated as that of Johns or the offenders in previous cases.

The present case differs significantly from those cases where the Court has sustained the death sentence, but is similar to the situation this Court faced in State v.

*McIlvoy*, 629 S.W.2d 333 (Mo. banc 1982). In *McIlvoy*, this Court reduced a death sentence to life imprisonment. Substantially all of the material facts and important characteristics of the defendant in the *McIlvoy* case are present here.

| **McIlvoy** | **Bibb** |
|---|---|
| 24 year-old male | 23 year-old male |
| "only minimal juvenile record" | "No criminal record" |
| IQ=81 | IQ=75 |
| "limited education" | "illiterate" |
| drunk at commission of crime | abuse of marijuana before crime |
| "voluntarily turned himself in and confessed" | "voluntarily turned himself in and confessed" |

As in *McIlvoy*, appellant was neither a leader nor an instigator of his crime. Both in *McIlvoy* and in this case, the co-conspirators, as part of a plea bargain, were given life sentences. More importantly, in *McIlvoy*, there was some evidence of a killing for hire, there was some evidence of a prior rehearsal of the killing, and a jury found that McIlvoy's crime was "wantonly vile, horrible or inhuman in that it involved torture or depravity of mind." Again, unlike *McIlvoy* and all of our other previous death penalty cases, appellant here pled guilty.

This Court's proportionality analysis requires including those *similar* capital murder convictions where the defendant received a sentence of life imprisonment. *State v. Bolder*, 635 S.W.2d 673 (Mo. banc 1982). Comparison of similar life sentence crimes becomes difficult because in most

instances the crimes in those cases were much more aggravated than that of the instant case.[6] I believe that *State v. Jensen* is comparable to the present case and indicates that appellant's death sentence here is disproportionate. *Jensen* involved a young man who shot his supervisor when she discovered him stealing. Jensen turned himself in, voluntarily confessed, and was emotionally distressed when he shot his supervisor.

I have an even more basic concern about this and similar cases. The Eighth Amendment forbids the imposition of a death sentence when this penalty would be disproportionate to the punishment given for other similar crimes. *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982); *Weems v. United States*, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910).

6. Comparable cases where a capital murder was committed in the course of a robbery and the defendant received a life sentence include: *State v. Turner*, 623 S.W.2d 4 (Mo. banc 1981) (defendant killed two people); *State v. Jensen*, 621 S.W.2d 263 (Mo.1981) (defendant killed his supervisor when she discovered him stealing); *State v. Baskerville*, 616 S.W.2d 839 (Mo.1981) (defendant killed a 7 year-old boy, his mother, and his uncle); *State v. Mitchell*, 611 S.W.2d 223 (Mo. banc 1981) (defendant and his friend robbed a store stabbing the owner and an employee); *State v. Royal*, 610 S.W.2d 946 (Mo. banc 1981) (defendant robbed a bank, kidnapped and killed a teller); *State v. Downs*, 593 S.W.2d 535 (Mo.1980) (defendant and friends robbed a store, killed the owners, and killed the daughter as she begged for mercy); *State v.*

*Williams*, 678 S.W.2d 845 (Mo.App.1984) (defendant robbed his uncle, beat him with bricks, and ran over his uncle 5 times with a car); *State v. Laws*, 668 S.W.2d 234 (Mo.App.1984); (defendant stabbed, choked, and burned his 68 year-old victim); *State v. Henderson*, 666 S.W.2d 882 (Mo.App.1984) (defendant killed an elderly man during a robbery); *State v. Woolsey*, 664 S.W.2d 37 (Mo.App.1984) (defendant carried out his plan to kill his mother-in-law, he took her to a remote area, shot her, and hid the body); *State v. Woods*, 662 S.W.2d 527 (Mo.App.1983) (defendant, who had attended college, stabbed a young woman seven or eight times; *State v. Scott*, 651 S.W.2d 199 (Mo.App.1983) (defendant entered an elderly couple's home, robbed, and stabbed them).

The Legislature of Missouri has specifically ordered this Court to review death sentences imposed by Missouri courts and determine if the sentence is proportionate. § 565.014, RSMo 1978.

When we permit one person to plea bargain for his or her life in return for testimony that will insure another person's death, we have rendered proportionality meaningless. This Court should not permit one individual, the prosecutor, to determine who shall live and who shall die. Proportionality cannot mean less than giving the defendant no greater punishment than that approved by the judicial system for the co-defendant who has plea bargained to save his life.

The question in this case should not be whether appellant voluntarily waived a right to a jury determination for punishment or whether appellant committed the crime and should be punished, but rather what level of punishment is appropriate. Because of the specific and special facts of this case, I would hold that a death sentence in this case is disproportionate.