ANUHCO, INC., f/k/a American Carriers, Inc.,

and

American Freight System, Inc., Respondents,

v.

WESTINGHOUSE CREDIT CORP., Appellant,

Commercial Finance Association, Inc., Amicus Curiae.

No. WD 47719.

Missouri Court of Appeals, Western District.

July 12, 1994.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 30, 1994.

Application to Transfer Denied Oct. 25, 1994.

Sheldon Karon, Barbara J. Mulvanny, Keck, Mahin & Cate, Chicago, IL, George M. Bock, John J. Williams, III, Slagle, Bernard & Gorman, Kansas City, for appellant.

R. Lawrence Ward, William E. Quirk, Jennifer Gille Bacon, P. John Brady, Gregory M. Bentz, Shughart Thomson & Kilroy, P.C., Kent E. Whittaker, Hillix, Brewer, Hoffhaus, Whittaker & Wright, Kansas City, for respondents.

F. Russell Millin, Millin & Trader, Kansas City, A. Bruce Schimberg, Michael J. Sweeney, Kathleen M. Mulligan, Sidley & Austin, Chicago, IL, for Commercial Finance Ass'n, Inc., amicus curiae.

Before KENNEDY, P.J., and ULRICH and SPINDEN, JJ.

ULRICH, Judge.

Westinghouse Credit Corporation (Westinghouse) appeals the judgment entered on a jury verdict in the sum of $70,000,000 awarded to American Carriers, Inc., (American Carriers) and its trucking company subsidiary, American Freight System, Inc. (American Freight) for breach of contract.[1] The plaintiffs contended that Westinghouse anticipatorily breached a conditional loan commitment to plaintiffs to the sum of $65,000,000. The jury returned its verdict for American Carriers and American Freight and judgment was entered for $70 million. Westinghouse appealed the judgment, asserting nine points on appeal. Westinghouse claims that (1) insufficient evidence was presented to establish that the claimed injury was reasonably foreseeable as the probable result of Westinghouse's decision not to provide credit after the contract between Westinghouse and American Carriers became binding; (2) Instruction No. 12 (MAI 4.01) omitted an essential element for recovery of consequential damages in that it failed to limit the jury to awarding such consequential damages as were reasonably foreseeable to Westinghouse; (3) the evidence failed to establish the causal connection between Westinghouse's failure to provide the loan to American Carriers and plaintiffs' Chapter 11 bankruptcy reorganization; (4) the evidence was insufficient to support an award for American Carriers' lost future profits or to support a finding that plaintiffs would have had a value of $120,000,000; (5) the evidence failed to include proof of the value of American Carriers at the end of June 1988 without the Westinghouse Credit facility in place, an essential requirement for recovery of diminution in market value; (6) impermissible prejudicial hearsay testimony was permitted over Westinghouse's objection; (7) the court erroneously precluded, to Westinghouse's prejudice, evidence of claims filed by American Freight in the American Carriers' bankruptcy case which tended to prove that Westinghouse's actions were not the cause of plaintiffs' bank-

1. Anuhco, Inc., did not exist when the contract was negotiated and is the successor in interest to American Carriers. American Freight was wholly owned by American Carriers, a holding company. In this opinion, American Freight is referred to when necessary to avoid confusion or when American Carriers' bankruptcy proceedings are discussed because American Freight, to protect its claims, filed a proof of claims in American Carriers' bankruptcy.

ruptcies; (8) the trial court erred in allowing American Carriers to introduce into evidence the Westinghouse business credit procedures manual, over objection, which contained only generalized hypothetical statements and inadmissible conclusions of law; and (9) Westinghouse was denied a fair and impartial jury, in that a juror concealed his involvement in prior litigation in response to questions during voir dire, and the court erroneously refused to sustain Westinghouse's motion for a new trial on this ground. The judgment of the trial court is affirmed.

### Facts

American Carriers, now Anuhco, Inc., and its subsidiary, American Freight, merged in November 1987 with a trucking company entitled Smith's Transfer. Smith's business was concentrated in the eastern United States while plaintiff's business was predominantly Midwestern. The merger made the new company one of the largest trucking companies in the United States. The merger resulted in no additional long-term debt. Available to the merged companies was a line of credit with Irving Trust Company and other banks (Irving Group) totaling $20 million, and $20 million in letters of credit that were necessary to secure the insurance required for the trucking operation. Approximately $150 million in unencumbered assets were owned by the new company.

The new company lost considerable revenue from the point of its formation. The combined computer system, used for scheduling, rate charging, and asset control, failed to perform as expected from the time of the merger in November 1987 until February 1988, and its failure to perform essential functions cost the company lost revenue. Additionally, the company suffered because of poor financial performance in the first quarter of 1988. The company defaulted on several financial performance covenants on March 31, 1988, threatening the company's line of credit with the Irving Group. The Irving Group advanced the company an additional $3 million on April 19, 1988, but refused to waive the company's default and informed the company that additional credit would be extended only on a case-by-case basis. The Irving Group directed the company to find another lender to replace the entire Irving Group loan.

The company's liability insurance carriers requested that the company post additional bank letters of credit upon renewal of its coverage in June 1988. The letters of credit were necessary to secure the company's obligations to its insurers to pay its self-insured retention amounts. The company had already drawn $16½ million for insurance letters of credit of its $20 million line of credit with the Irving Group when the insurer's demand that the company acquire another lender was communicated. The company's insurance carriers wanted $8.4 million in additional letters of credit to be posted in June 1988 to extend coverage until the end of that year.

The company's line of credit with the Irving Group consisted of $20 million in insurance letters of credit availability, $10.9 million in letters of credit for industrial revenue bond guarantee purposes, and a $20 million revolving line of credit for operations. By the end of March 1988, the company had drawn the full $10.9 million in industrial revenue bond letters of credit, $16.5 of its $20 million insurance letter of credit line, and it had borrowed $8 million on its $20 million revolving line of credit.

In March 1988, the company developed a plan to make its trucking operation profitable. The plan included operational changes and a detailed financial forecast. The financial forecast projected that the company would return to profitability in September 1988. The company estimated that it would need to borrow no more than $19 million on its then-existing $20 million line of credit with the Irving Group. Because of the demands of the company's insurers, the company required approximately $5 million in insurance letters of credit in excess of those available under the Irving Group credit line.

In April 1988, the company began to seek a lender to replace the Irving Group line of credit. The company's $150 million worth of assets remained unencumbered.

American Carriers and Westinghouse met for the first time on April 29, 1988. Ameri-

can Carriers provided Westinghouse a copy of its draft annual report for 1987, historical financial data, American Carriers' plan to obtain profitability, and the company's April 5th financial forecasts. Westinghouse was informed at this meeting that American Carriers was presenting its credit application to other lenders, too. American Carriers' situation with the Irving Group was explained, including information that the loan had been called and that the Irving Group was continuing to advance funds on the revolving line of credit. Westinghouse was informed that American Carriers needed to obtain additional insurance letters of credit by June to maintain the insurance coverage required by federal and state regulations to operate. American Carriers' existing insurance letters of credit in the amount of $16.3 million were to expire in June 1988. American Carriers needed to replace these letters of credit and needed to acquire an additional $9 million in letters of credit in June to secure insurance. American Carriers sought a line of credit totaling $75 million.

Following the April 29 meeting, Westinghouse verified information provided by American Carriers. Additional conversations occurred between American Carriers and Westinghouse and on May 10, 1988, Westinghouse issued its initial proposal letter to extend American Carriers' credit. The proposal was modified on May 11, and American Carriers accepted Westinghouse's proposal on the same date and paid Westinghouse a $200,000 good faith deposit demanded by Westinghouse. Westinghouse agreed to respond to American Carriers' credit application by May 23, 1988, if possible.

On May 12, 1988, Westinghouse representatives travelled to American Carriers' accounting center in Sioux Falls, South Dakota, to examine American Carriers' financial records and records of available collateral. The examination took two days, and on May 18, 1988, American Carriers' chairman and CEO and American Carriers' treasurer met with Westinghouse senior management in Pittsburgh, Pennsylvania.

American Carriers had met with the Irving Group on May 13 to negotiate amendments to the financial covenants in the loan agreement between American Carriers and the Irving Group, and the Irving Group's line of credit was extended through the end of 1988. The Irving Group's statement of intent to cure the events of default and to extend the existing line of credit to American Carriers through the end of 1988 was reported in American Carriers' annual report dated May 26, 1988, and filed with the Securities and Exchange Commission.

American Carriers provided Westinghouse additional information. Westinghouse was provided copies of contracts to sell real estate owned by American Carriers from which American Carriers expected to receive $5 million in extraordinary cash during the month of June. Additionally, Westinghouse was informed that American Carriers expected to receive $12 million in extraordinary cash in August 1988 as a refund from an over funded pension fund.

On June 2, 1988, Westinghouse's executive credit committee authorized issuance of a $65 million conditional loan commitment to American Carriers consisting of $40 million in insurance letters of credit and a $25 million revolving line of credit. The commitment letter was delivered to American Carriers the next day. The letter provided that before Westinghouse committed to the loan, specified conditions, including twelve "special conditions," were to be satisfied by American Carriers to Westinghouse's satisfaction. Special condition No. 11 stated: "The May 31, 1988 operating results of Borrower are to be reviewed prior to the closing of WCC's accommodation and found to be in line with projected operating results." [2] American Carriers signed the commitment letter on June 6, 1988, accepting the offer and the conditions and returned the agreement to Westinghouse the same day.

The conditional loan commitment prompted reaction. American Carriers notified its insurance carriers of the Westinghouse commitment. On June 6, the insurance compa-

---

**2.** The trial court found condition No. 11 to be ambiguous, and the jury was instructed that the condition was ambiguous.

nies extended American Carriers' insurance coverage to July 11, 1988, provided that American Carriers receive assurance during the week of June 20 that additional letters of credit were forthcoming. American Carriers provided Westinghouse an amended annual report form 10–K, dated June 7, 1988. The annual report reflected that the Irving Group had expressed intention to cure the events of default and to extend American Carriers' line of credit to the end of 1988.

Westinghouse representatives conversed on June 10 about American Carriers' May operating results. American Carriers' May performance results had been provided to Westinghouse on June 9. American Carriers' May sales revenues were approximately $5.3 million (12%) below American Carriers' April 5th forecast.[3] American Carriers reported a May net loss of $5 million, smaller than the $5.4 million net loss that had been forecast.

Disagreement existed within Westinghouse as to whether American Carriers' operating results satisfactorily met condition No. 11. Richard McDonald, Senior Vice President, Westinghouse Credit Corporation, testified at trial that he concluded the May operating results did not satisfy condition No. 11 because American Carriers' revenues were 11% to 12% below the amount forecast. American Carriers' operating ratio of 110.1% was worse than the 109.5% forecasted, and the deviation from the forecast suggested to Westinghouse that American Carriers might be unable to forecast financial performance and to effect its plan to return to profitability.

American Carriers and Westinghouse representatives met on June 21, 1988. Special condition No. 11 was discussed. The parties differ as to what occurred at the June 21 meeting. American Carriers' representatives claimed Westinghouse informed them the May results had been approved and that Westinghouse would extend credit to American Carriers. The Westinghouse representatives testified at trial that they informed the American Carriers representatives that American Carriers had not satisfied condition

No. 11 because American Carriers' May financial performance had been unsatisfactory but that Westinghouse said it would reconsider funding the line of credit dependent upon Westinghouse's approval of American Carriers' June financial performance. According to Westinghouse, American Carriers requested Westinghouse to proceed with loan documentation at American Carriers' expense to facilitate a more rapid closing if the loan closed. The parties also discussed a prefunding audit and a tentative closing date of July 11–12, 1988 for the loan.

Although the commitment letter agreement required that American Carriers' May operating results be satisfactory to Westinghouse, American Carriers provided Westinghouse with its preliminary estimate of its June operating results on June 22, 1988. American Carriers projected that its June revenues would be $6.7 million below the company's April 5th forecast and that American Carriers' June loss would be $3.6 to $3.9 million. Westinghouse concluded that American Carriers' June performance failed to meet its April 5th forecast and did not satisfy its plan to return to profitability.

On June 24, 1988, representatives of the two parties to the agreement met again. Westinghouse informed American Carriers that the loan transaction was "on hold" and that the loan could not close in early July.

A telephone discussion between Westinghouse and American Carriers' representatives occurred following the June 24 meeting. The American Carriers' representative informed the Westinghouse representative that American Carriers must close the loan by July 12 in order to meet the insurance deadline. The reasons for American Carriers' failure to meet its projected performance in May and June were discussed. The Westinghouse representative stated again the reasons for Westinghouse's decision not to proceed with the loan and informed the American Carriers' representative that Westinghouse would reconsider an extension of credit based upon additional financial information that included the final financial operating

---

3. Westinghouse also learned during the meeting that American Carriers' management expected

the company's revenues for the balance of 1988 to be 16% to 18% below the April 5th forecast.

results for June. American Carriers provided no additional information to Westinghouse thereafter.

On July 5, 1988, American Carriers issued a press release stating that Westinghouse financing had been placed "on hold." The press release stated that Westinghouse's refusal to close the loan "could jeopardize [American Carriers'] insurance coverage, which is currently due to expire on July 11, 1988, and working capital, both of which are necessary to continued operations." American Carriers claimed at trial that it was compelled to issue the press release because it had earlier publicly announced Westinghouse's commitment letter to loan money, and American Carriers was obligated by law to inform the public as a publicly held corporation that the commitment had been withdrawn.

Following the July 5 press release, American Carriers sought alternative financing. American Carriers obtained an agreement to provide the necessary insurance letters of credit from another lender, Fidelcor Business Credit (Fidelcor). American Carriers' insurance carrier agreed to extend its insurance coverage until mid-September. American Carriers was unsuccessful in acquiring sufficient funding from Fidelcor to satisfy its needs in the time available, and the $12 million Teamster pension plan reversion expected was not received by American Carriers because Irving asserted a competing claim for the sum. American Carriers also attempted unsuccessfully to obtain financing from Rothchild Associates, another lending entity.

American Carriers made additional press releases in July 1988. On July 7, 1988, American Carriers issued a press release identifying a new lending source and stating that insurance coverage continued. On July 8, American Carriers issued its third press release announcing that it had obtained additional insurance letters of credit and was finalizing an agreement for new credit with another lender.

On July 11, 1988, Westinghouse refused American Carriers' demands for immediate credit, citing several reasons. $133,366.75 were refunded to American Carriers from the initial $200,000 deposit. A $50,000 fee was retained, and $16,633.25 were retained for attorney's fees incurred during the transaction.

On July 21, 1988, American Carriers and Fidelcor agreed on terms for refinancing American Carriers' line of credit. In early July, Fidelcor had conducted an audit of American Carriers' business and collateral.

Although American Carriers ceased operating American Freight in the northeast section of the United States during July, American Carriers continued discussions with the Irving Group during July and early August 1988, to extend the existing credit arrangement between them. American Carriers opposed the Irving Group's desire for American Carriers to pledge additional security on the loans previously extended.

American Carriers filed for Chapter 11 protection in bankruptcy court on August 16, 1988. American Carriers liquidated American Freight's assets, and American Carriers and American Freight emerged from Chapter 11 reorganization in July 1991.

American Carriers and American Freight filed suit against Westinghouse. The plaintiffs alleged that the defendant breached the June 3, 1988, commitment letter agreement to extend to them $65 million in credit.

Plaintiffs called expert witnesses to testify at trial. Plaintiffs' expert testified that plaintiffs' bankruptcies were caused by the July 5 press release that Westinghouse had placed its lending commitment to American Carriers "on hold." The expert testified that as of the end of June 1988, American Carriers needed an influx of capital to provide the necessary cash to operate the business until it returned to profitability. He claimed that American Carriers would have been a viable trucking company had it received the Westinghouse financing. A second expert testified that American Carriers "would be alive and well today and a major player" had it received the Westinghouse funding.

Following jury verdict for plaintiff in the sum of $70 million, the trial court entered judgment for the plaintiffs for that sum, and Westinghouse appealed.

### (1)

Westinghouse claims as its first point on appeal that the trial court erred in not entering a directed verdict at the close of all the evidence and in not entering judgment notwithstanding the verdict for plaintiffs' failure to present sufficient evidence to establish the indispensable element of proof that plaintiffs' claimed injury was reasonably foreseeable to Westinghouse at the time Westinghouse's commitment letter was accepted by American Carriers and returned to Westinghouse as a contract. Westinghouse claims that no evidence exists in the record to support a finding that it knew or had reason to believe that plaintiffs could not obtain a line of credit from other available sources of credit, that a press release could cause plaintiffs' bankruptcy, or that plaintiffs would cease efforts to obtain credit from other lenders and elect to file Chapter 11 bankruptcy protection. Thus, Westinghouse claims plaintiffs failed to prove Westinghouse could have reasonably contemplated the probability of the losses experienced by plaintiffs at the time the contract was entered into. *Kim v. Conway & Forty, Inc.,* 772 S.W.2d 723, 728 (Mo.App. 1989).

■ Westinghouse asserts that the trial court erred in refusing to enter its judgment n.o.v. Because the contention contests the sufficiency of the evidence, the recorded evidence presented at trial is viewed in the light most favorable to the verdict, and all inferences to the contrary are disregarded. *Wion v. Carl I. Brown & Co.,* 808 S.W.2d 950, 952 (Mo.App.1991). "A judgment notwithstanding the verdict is proper only if upon such a view of the evidence, reasonable minds could not differ as to the proper verdict." *Id.* at 952–53.

■ Westinghouse's assertion—that the trial produced insufficient evidence to establish that, when its commitment letter was accepted by American Carriers and returned to Westinghouse, it could not reasonably foresee the claimed damages to American Carriers if it failed to provide the loan pursuant to the agreement—is incorrect. The evidence at trial established that Westinghouse had numerous meetings with American Carriers' representatives, examined American Carriers' records, and was aware at least as early as May 1988 of the serious cash flow problem experienced by American Carriers. Westinghouse knew that American Carriers' cash flow problem began before American Carriers and its subsidiary, American Freight, merged with Smith's Transfer in 1987 and that the problem continued after the merger. American Carriers' projected additional losses were known to Westinghouse before the commitment letter was transmitted. Westinghouse knew that American Carriers' line of credit with the Irving Group was threatened because American Carriers had defaulted on March 31, 1988, by failing to satisfy several financial covenants. Westinghouse was aware that although the Irving Group had offered to advance an additional $3 million on April 19, 1988, the Irving Group had informed American Carriers it must find another lender, that it would not waive the default, and that American Carriers must satisfy the debt owed to it by repaying the funds extended pursuant to a $20 million line of credit. Westinghouse knew that American Carriers, although possessing approximately $150 million in unencumbered assets, needed cash to pay overdue sums of $3 million a month into the Teamsters Pension Fund, to pay its self-insured retention amounts, and for operating capital. American Carriers projected more substantial losses for the immediate future, and Westinghouse knew of the projections and the plan to make American Carriers profitable. Westinghouse knew that American Carriers had failed to comport with American Carriers' May projections to attain profitability. The evidence established that Westinghouse knew of American Carriers' exigent need for the cash provided by the loan in order to survive and conduct business.

Westinghouse knew that other lenders were not feasible alternative lending sources. The evidence showed Westinghouse's business was to loan large sums of money to companies in cash flow distress. Westinghouse knew American Carriers' cash need was immediate and that failure to receive the committed loan threatened American Carriers' ability to maintain essential insurance

coverage, without which American Carriers could not legally operate. From the evidence the jury could reasonably infer that few prospective lenders existed from which American Carriers could obtain an immediate loan of at least $65 million. Of the sources available, the jury could reasonably determine from the evidence about the length of the investigation conducted by Westinghouse before approving American Carriers' May operating results that American Carriers could not have obtained an immediate loan necessary to satisfy its imminent cash needs. Westinghouse knew American Carriers had defaulted on existing loans to the Irving Group, that its access to additional funds from the Irving Group was limited and subject to approval, that the Irving Group had refused to extend American Carriers additional credit, and that the Irving Group wanted American Carriers to obtain another lender to cover the loans previously advanced by it.

Westinghouse's claim that it could not reasonably foresee the American Carriers' July 5, 1988, press release could cause American Carriers' bankruptcy is determinative. American Carriers' press release, in compliance with regulation, of Westinghouse's refusal to complete the loan was a probable occurrence that Westinghouse did or should have anticipated when it declined to extend the loan. Westinghouse knew American Carriers' financial stability was tenuous and the failure to provide the loan pursuant to the agreement could reasonably cause American Carriers' inability to satisfy impending insurance premiums, to cease operations, and to seek bankruptcy protection. The evidence shows that American Carriers issued the July 5, 1988, press release to satisfy its obligation to inform its stockholders and the public that the anticipated loan would not be provided. Westinghouse's failure to complete the loan pursuant to the agreement necessitated the press release. American Carriers' experts testified that the press release negatively impacted on American Carriers' cash flow which led to bankruptcy. Thus, Westinghouse's failure to complete the loan resulted in American Carriers' reduced revenue. The resulting reduced revenue experienced by American Carriers after the July 5 press release was reasonably foreseeable because of the reluctance of customers and potential customers to use American Carriers' services for fear that the company would not survive. Westinghouse, sophisticated in the business of lending large sums of money to struggling businesses and knowledgeable of the trucking industry, knew or should have known that the contents of the July 5 press release would be provided to the public and knew or should have known of the probability that American Carriers' revenue would diminish and that American Carriers' diminished revenues, knowing its precarious financial situation, would likely result in bankruptcy.

Westinghouse's assertion that it could not reasonably foresee American Carriers would cease efforts to obtain credit from other lenders after Westinghouse informed American Carriers that the loan was "placed on hold" is not a viable defense. Westinghouse knew that American Carriers was not negotiating with another potential source when the loan offer was extended and accepted. When American Carriers received the May 11 proposal letter and paid Westinghouse the $200,000 demanded, Westinghouse expected American Carriers would not attempt negotiations with any other prospective lender. The evidence discloses that during negotiations with Westinghouse and after the loan commitment letter was presented American Carriers' May and June records disclosed that it continued to lose millions of dollars. Although the jury found Westinghouse approved American Carriers' May operation figures, the continued loss experienced by American Carriers in May and June and the amount of business done by American Carriers in those months caused Westinghouse not to make the loan. American Carriers' cash was virtually depleted. American Carriers' rapidly deteriorating financial condition and its desperate need for cash to continue operating were not secret to Westinghouse. Timely acquisition of a $65 million or greater loan from another source to permit American Carriers to cover its insurance requirement, to pay to the Teamsters Retirement Fund the several million dollars it then owed and the additional $3 million owed each month

thereafter, and to satisfy its daily cash operating needs was not feasible in the short time available to American Carriers. Before extending its loan commitment, Westinghouse had undertaken an investigation requiring several weeks, and that probe had been expedited. The evidence supported the conclusion that American Carriers would not survive long enough for another such inquiry before another lender would make the same or a greater loan, provided that another lender would then consider American Carriers' condition healthy enough to make the loan. It is unreasonable to believe that another lender capable of lending the money sought by American Carriers would not be hesitant to lend the money any more quickly than Westinghouse would have, especially when it knew that Westinghouse had declined to make the loan after extending its commitment letter. Point (1) is denied.

## (2)

■ . Westinghouse claims as point (2) that the trial court erred in refusing to sustain its motion for a new trial because the court erred, to Westinghouse's prejudice, when it gave instruction number 12 (MAI 4.01) and when it refused Westinghouse's proffered instruction number (E). Westinghouse contends that instruction number 12 failed to limit the jury to consequential damages reasonably foreseeable to Westinghouse at the time the commitment letter became the agreement between the parties. Instruction number 12 stated:

If you find in favor of the plaintiffs then you must award plaintiffs such sum as you believe will fairly and justly compensate plaintiffs for any damages you believe they sustained as a direct result of the conduct of defendant as submitted in Instruction No. 9.

Instruction number 9, the verdict directing instruction, stated:

Your verdict must be for plaintiffs if you believe:

First, plaintiffs and defendant entered into an agreement whereby defendant agreed to provide plaintiffs a revolving credit facility and a letter of credit facility as set out in its June 3, 1988 commitment letter, if

plaintiffs would meet the terms and conditions set out in the commitment letter, and

Second, plaintiffs either met or could have met the conditions set out in the June 3, 1988 commitment letter, and

Third, defendant failed to perform its agreement, and

Fourth, plaintiffs were thereby damaged, and

Fifth, such damages were reasonably foreseeable to defendant at the time the commitment letter was accepted, unless you believe plaintiffs are not entitled to recover by reason of Instruction Nos. 10 or 11.

Instruction number E, proffered by Westinghouse in place of Instruction No. 12, and rejected by the trial court, stated:

If you find in favor of plaintiffs on plaintiffs' claim for damages for breach of contract, then you must award plaintiffs such sum as you believe will fairly and justly compensate plaintiffs for any damages you believe plaintiffs sustained as a direct result of the conduct of defendant and which were within the reasonable contemplation of the defendant as the probable result of a breach at the time the parties entered into the contract.

Westinghouse cites *Crank v. Firestone Tire & Rubber Co.,* 692 S.W.2d 397 (Mo.App. 1985), as support for its contention that instruction No. 12 (M.A.I. 4.01) was erroneous because American Carriers sought consequential damages and MAI 4.01 does not properly state the measure of consequential damages. *Id.* at 402–03. Westinghouse claims that ascertaining the proper measure of consequential damages for breach of contract requires the jury to determine those damages "reasonably foreseeable as the probable result of the breach." In *Crank,* an automobile owner sued a service garage to recover consequential damages, alleging breach of warranty of workmanlike performance of maintenance of his vehicle. The vehicle owner was awarded judgment, and the service garage appealed. This court determined in *Crank* that the trial court had erred in using MAI 4.01 to instruct the jury on the measure of damages because MAI 4.01 does not follow the law on the measure

of consequential damages. Judge Nugent, writing for the court, said:

> The use of M.A.I. 4.01 has been approved in breach of contract cases, *Gottlieb v. Hyken,* 448 S.W.2d 617, 621 (Mo.1970), but its use in assessing special damages in a contract case has been criticized. *Shurtz v. Jost,* 597 S.W.2d 652, 655 (Mo.App.1979). By allowing for recovery of damages directly resulting from the occurrence, M.A.I. 4.01 substantially follows the rule for damages naturally and proximately arising from the breach, but it does not provide for damages that were reasonably contemplated by the defendant at the time it warranted its work.

*Crank v. Firestone & Rubber Co.,* 692 S.W.2d at 403.

However, unlike *Crank,* the trial court in this case instructed the jury, using Instruction No. 12 (damage instruction), that it was required to consider the verdict director (Instruction No. 9) when determining damages sustained by American Carriers if it first found in favor of American Carriers. Instruction No. 12 was short, simple, easily understood, and easily followed. The two instructions together discussed damages, were not conflicting, and did not misdirect the jury. *See Larabee v. Kansas City,* 697 S.W.2d 177, 181 (Mo.App.1985) (holding that before reversible error could be predicated on the giving of MAI 4.02 where damage resulted from multiple causation and the jury should have been required by instruction to separate or apportion the damages directly resulting from defendant's negligence, the appellant must show that the jury was misdirected "under all the evidence and the other instructions"). Instruction No. 9 contained paragraph Fifth, which required the jury, as a condition precedent to deciding for American Carriers, to find that any damages sustained by the plaintiff, as a result of defendant's breach of contract, "were reasonably foreseeable to defendant at the time the commitment letter was accepted." Thus, if paragraph Fifth of instruction No. 9 properly states the law for determining when special damages are accessible, point (2) must fail.

The court in *Kim v. Conway & Forty, Inc.,* 772 S.W.2d at 728, stated, "A party may recover special damages if the parties 'could have reasonably contemplated the probability of such losses at the time the contract was entered into.'" (citation omitted). Thus, if parties to a contract could, at the time the contract was entered into, reasonably have foreseen the losses that resulted from the breach of the contract, special damages may be assessed. Therefore, paragraph Fifth of Instruction No. 12 required the jury to find, before awarding special damages, that Westinghouse could reasonably have forecast or predicted when the commitment letter was formally accepted by American Carriers that the damages proved by American Carriers would probably occur if Westinghouse breached the contract and did not make the loan. Paragraph Fifth of Instruction No. 9 properly stated the measure of damages for consequential damages in Missouri. Thus, the jury was compelled by the trial court's instructions to award consequential damages, the only type sought, if the probability of the damages was "reasonably contemplated by the defendant at the time" the contract was breached. *Id.* Point (2) is denied.

### (3)

■ Westinghouse claims as its third point on appeal that the evidence failed to establish the required proximate causal connection between Westinghouse "placing the loan on hold" and American Carriers' Chapter 11 bankruptcy reorganization. Therefore, Westinghouse asserts, the trial court erred in refusing to sustain its motion for directed verdict at the close of all the evidence and its motion for judgment notwithstanding the verdict.

For clarification, the damages sustained by American Carriers were not simply Chapter 11 bankruptcy protection and reorganization. The damages sustained by American Carriers were the reasonably foreseeable consequences to Westinghouse's refusal to close on its agreement to make the loan. The loss of the loan caused American Carriers to seek Chapter 11 protection because it did not have the immediate cash to meet its operating needs and because loss of the loan resulted in the July 5 press release and additional lost revenues which exacerbated American Carri-

ers' cash flow problems, thereby precluding American Carriers from attempting to attain profitability pursuant to the plan reviewed by Westinghouse before the parties agreed to the loan, resulting in bankruptcy.

Evidence was presented at trial from which the jury could find that Westinghouse's refusal to extend the loan as it had agreed caused American Carriers to file for Chapter 11 protection when it did. Roy Coxe, a trucking consultant for approximately twenty years to over one hundred American trucking firms and American Carriers' expert witness, testified that he reviewed "all of the information about [American Carriers]," including annual reports, comprehensive financial records, and operational records from approximately 1983 until the company filed for Chapter 11 protection. He interviewed twenty company management people. He concluded that the company had a short-term cash need and that it could have survived had it received funding. Mr. Coxe also opined that the July 5, 1988, press release [4] issued by American Carriers when the company was informed by Westinghouse that the loan was "placed on hold" caused the American Carriers' bankruptcy because the shipping public responded adversely to that press release. From Mr. Coxe's statement, the jury could reasonably infer that because of the press release the shipping public was reluctant to use American Carriers and chose not to ship products by the trucking firm causing reduced income for the company. Evidence was presented that the company's revenues dropped between $400,000 and $600,000 per day during July 1988 from revenues experienced during the preceding month.

William Jaquith, a second trucking consultant, testified as an expert witness for American Carriers. Mr. Jaquith had been in the trucking industry in some capacity since he was twelve years old and worked for his father's company. In addition to formal education which provided him both a bachelors degree and a Masters in Business Administration, Mr. Jaquith had advised many trucking companies about how they could better conduct their businesses. He testified that the July 5 press release that stated American Carriers' insurance status was in jeopardy because of the loss of the loan resulted in an immediate loss of business by American Carriers, which meant a reduction in revenue for the company. Mr. Jaquith testified that because federal law requires trucking lines to be insured, shippers do not ship with an uninsured company. Additionally, Mr. Jaquith testified that had American Carriers received the loan from Westinghouse as agreed, American Carriers "would be alive and well today and a major player" in the trucking industry.

Mr. Coxe's and Mr. Jaquith's testimonies, uncontested on appeal, provided sufficient evidence on the element of causation to support the jury's verdict. Point (3) is denied.

### (4)

Westinghouse contends as point (4) that the trial court erred in refusing to sustain its motion for directed verdict at the close of all the evidence and in refusing to order a new trial on the issue of damages, asserting that American Carriers failed to produce evidence legally sufficient to prove an amount of lost future profits to support an award for consequential damages. Westinghouse claims that American Carriers' evidence failed to show the company was profitable in a period preceding the time for which American Carriers claims loss of projected future profits. American Carriers asserts that its evidence of damages was not dependant on lost future profits. Specifically, American Carriers' claims that of the four methods used at trial to determine the company's value and its damages, the first two did not involve consid-

---

4. American Carriers asserted that it was compelled by law to make the press release to its stock holders and the shipping public. The July 5, 1988, press release issued by American Carriers stated:

American Carriers, Inc. has been informed that its new $65 million credit commitment has been placed on hold by the lending source.

This delay could jeopardize the Company's insurance coverage, which is currently scheduled to expire on July 11, 1988, and working capital, both of which are necessary for continued operations. The Company is pursuing other financing sources, continued extension of insurance coverage, and alternative insurance sources at this time.

eration of future lost profits and, therefore, Westinghouse's claimed error is harmless. American Carriers also claims that it enjoyed a long history of profitability which made consideration of lost future profits proper for jury reflection. Lost profits were projected, considered, and included in two of the evaluation techniques discussed by American Carriers' damage experts at trial.

American Carriers' damage expert, John Throckmorton, testified that he used four different evaluation techniques to compute the value of American Carriers' business as of June 30, 1988. He classified these as (1) the comparable sales, (2) asset value, (3) discounted free cash flow, and (4) industry ratios methods for determining the value of American Carriers. The comparable sales and asset value methods did not consider lost profits. The discounted free cash flow and industry ratios methods each included a projection of future lost profits. Mr. Throckmorton testified that by using the comparable sales technique, he evaluated the company's value at $101 to $103 million. Using the asset value technique, he evaluated the company's value at $101 million. Using the discounted cash flow method, Mr. Throckmorton valued the company at $116 million, and using the industry ratios method, he valued American Carriers at $115 million. Thus, claims American Carriers, because the verdict and judgment were in the sum of $70 million, the value of the company's worth was determined by any of the four methods utilized to determine the company's worth to be greater than the amount of the judgment, and two of the methods used to evaluate the company's value did not consider lost profits, if future lost profits were not adequately documented and were improperly considered by Mr. Throckmorton, such error was harmless.

■ Proof of lost profits is exacting. Speculation as to probable or expected lost business profits is spurned, and proof of lost profits must be substantial. *Coonis v. Rogers*, 429 S.W.2d 709, 713–14 (Mo.1968). The court in *Coonis* said:

The general rule as to recovery of anticipated profits of a commercial business is that they are too remote, speculative, and too dependent upon changing circumstances to warrant a judgment for their recovery. They may be recovered only when they are made reasonably certain by proof of actual facts, with present data for a rational estimate of their amount; and when this is made to appear, they may be recoverable. (Citations omitted).

*Id.* at 714. Recovery for anticipated profits of a commercial business are generally "too uncertain and dependent upon changing circumstances to warrant a judgment for their recovery." *Brown v. McIBS, Inc.*, 722 S.W.2d 337, 341 (Mo.App.1986). While lost profits may be recoverable when they are shown to have been the natural and probable consequences of an act or omission, they must be shown by reasonable certainty. *Southern Missouri Bank v. Fogle*, 738 S.W.2d 153, 158 (Mo.App.1987). Lost anticipated profits are recoverable only when they are made reasonably certain by proof of actual facts which present data for a rational estimate of such profits. *Brown*, 722 S.W.2d at 341. Recovery for lost profits is not permitted when uncertainty and speculation exist as to whether lost profits would have occurred or whether lost profits emanated from the wrong. *Fogle*, 738 S.W.2d at 158.

■ Whether American Carriers experienced lost anticipated profits as a result of Westinghouse's breach of contract was not established by American Carriers' expert, Mr. Throckmorton. Lost profits were not "made reasonably certain by proof of actual facts, with present data for a rational estimate of their amount." *Coonis*, 429 S.W.2d at 714. Mr. Throckmorton's projections of lost profits were unsupported by specific and substantial evidence and constituted conjecture and supposition. Therefore, the two methods used by Mr. Throckmorton to project the value of American Carriers on June 30, 1988, were improper because they each considered as a part of their methodology projected lost profits.

■ Despite the erroneous use of speculative lost profits in two of the four methods used to evaluate American Carriers on June 30, 1988, the error was harmless. Two methods utilized by Mr. Throckmorton to evaluate American Carriers' value did not consider

lost profits. Because the jury evaluated the damages to American Carrier and awarded its verdict for $70 million, a sum considerably less than any of the four sums determined by Mr. Throckmorton utilizing the four methods about which he testified, the error is harmless. Point (4) is denied.

### (5)

Westinghouse contends as point (5) that American Carriers, to prove damages, was compelled by law to show diminution in the company's fair market value by presenting evidence of American Carriers' value both "with the Westinghouse credit facility and without the credit facility," i.e., with the loan and without the loan. Westinghouse asserts that American Carriers presented evidence of the company's market value "with the Westinghouse credit facility in place only," and that failure to present evidence of American Carriers' fair market value without the Westinghouse loan precluded calculating the diminution of value of the company's business. Thus, Westinghouse claims, American Carriers failed to prove damages, and the court erred in submitting the case to the jury.

American Carriers elicited from its expert, Mr. Throckmorton, the company's value on June 30, 1988, by the four methods, referred to under point (4). The methods utilized by Mr. Throckmorton evaluated the company's worth at between $101 million and $164 million on June 30, 1988, prior to the breach of contract. Thus, American Carriers asserts that it proved the value of the company immediately before Westinghouse breached the loan commitment agreement.

American Carriers proclaims that it proved it had no value after it filed bankruptcy, caused, it claims, because Westinghouse breached the loan commitment agreement by refusing to extend the loan which necessitated the July 5 news release. The news release, American Carriers claims, resulted in customers' aversion to use its services that caused the loss of essential revenue and required the company to file bankruptcy. Timothy O'Neil, chief financial officer of American Carriers and President and chief executive officer of American Freight, testified that the plaintiff companies lost their entire value after filing bankruptcy pursuant to Chapter 11. The company sold virtually all of its 258 terminals and was attempting to sell the remainder when the trial occurred. The company had liquidated its trucks at auctions held in 39 cities throughout the United States and had sold its furniture, computers, forklifts, and other equipment. The proceeds from the sale of the company's assets were used to pay the 40,000 claims filed in the bankruptcy estate. American Freight had ceased operation when bankruptcy proceedings were filed. American Carriers, or its successor company, received a total of $6,050,000 from the bankruptcy estate. American Carriers' successor continued to operate, having purchased a small to medium sized truck line in Carroll, Iowa.

Westinghouse claims that American Carriers, to prove damages, was compelled to show the value of the company without the loan to facilitate comparison of the company's value with the loan. Westinghouse cites *Stamps v. Southwestern Bell Telephone*, 667 S.W.2d 12 (Mo.App.1984), as support of its position that American Carriers failed to introduce sufficient evidence to permit the comparison. In *Stamps*, advertisers filed suit against Southwestern Bell for breach of an agreement which provided for the insertion of Yellow Page advertising and reservation of two phone numbers. *Id.* at 13. Dispute arose when the telephone company asked the advertisers to attest to the accuracy of the advertisements in the 1975 Yellow Page directory, the advertisers refused to sign the attestation form, and the phone company demanded payment in advance for the aggregate monthly payments as a condition to rendering service. *Id.* The advertisers sought recovery for lost income and the complete loss of their business. *Id.* at 14. The appellate court determined that the plaintiff advertisers had not presented sufficient evidence to sustain the $50,000 judgment for actual damages. *Id.* The evidence presented by the advertisers of the complete loss of their business consisted of placing a value on the business on or about the date connection was requested for the two telephone numbers, payment was demanded by the tele-

phone company and refused by the advertisers, and the phone company declined to connect the two lines. *Id.* at 13. The advertisers offered no other evidence of the value of their business "other than general statements that they were forced out of St. Louis, or forced to move the business, by not having access to Yellow Pages advertising." *Id.* at 14. The advertisers' evidence on lost profits was the decline in gross receipts. *Id.* The Eastern District determined that the evidence failed to prove lost profits. *Id.*

Unlike the advertisers in *Stamps,* American Carriers' proof of damages evinced the company's demise and liquidation to satisfy its creditors in bankruptcy court. The expert testimony of Mr. Throckmorton permitted the jury to find that the breach of the loan commitment by Westinghouse caused the July 5 press release and the resultant loss of the company. The value of the successor company after receipt of approximately $6 million from the bankruptcy proceedings constituted the value of the company without the loan and permitted the comparison of the company with and without the loan. The award of the jury was within the approximately $120 million difference in the values of the company. Point (5) is denied.

### (6)

Westinghouse asserts as error the trial court's denial of its motion for a new trial for the trial court's refusal to sustain Westinghouse's objection to certain testimony of Gary Miller, president of several insurance companies, which provided insurance to American Carriers and specialized in providing insurance to the trucking industry. Westinghouse claims the portion of Mr. Miller's trial testimony recounting statements made to him by Mr. Robertson, Chairman of the Board, President, and Chief Executive Officer of American Carriers, in a June 22, 1988, telephone conversation between the two men was hearsay and inadmissible as a prior consistent statement because no impeaching statement of Mr. Robertson's trial testimony had been introduced before the prior consistent statement was offered. Westinghouse claims Mr. Miller's testimony of Mr. Robertson's statements improperly

bolstered Mr. Robertson's trial testimony and prejudiced Westinghouse.

Witness trial testimony conflicted about whether, during a meeting between representatives of American Carriers and Westinghouse at American Carriers' office on June 21, 1988, Frank Schockey, Westinghouse Regional Vice President, stated to Leon Robertson of American Carriers that American Carriers had satisfied condition No. 11 of the commitment letter (agreement) and that Westinghouse would proceed with the loan. Leon Robertson and Dwayne Glancy, representing American Carriers at the June 21 meeting and Frank Schockey and Lee Mosby, Regional Manager for Westinghouse, representing Westinghouse at the meeting, testified at trial. Gary Miller testified about Leon Robertson's comments to him by telephone on June 22, 1988, regarding Mr. Robertson's recollection of Mr. Schockey's statement at the June 21 meeting.

Gary Miller testified that the insurance companies with which he was associated had sold insurance policies to American Carriers. The policies carried by American Carriers included liability insurance, workers' compensation insurance, and cargo insurance. The policies provided that American Carriers was self insured for the first $2 million except for workers' compensation coverage, for which American Carriers was self-insured for the first $500,000 of liability. Additionally, one of the companies with which Mr. Miller was associated guaranteed, in the form of surety bonds, that if American Carriers could not pay the deductible amounts of the policies, it would pay the deductible amounts.

Mr. Miller testified that in May 1988, the insurance companies extended the excess policy, which was due to expire June 1, 1988, to July 11. Leon Robertson informed Mr. Miller on or about June 1, 1988, that American Carriers had obtained a commitment for an additional line of credit from Westinghouse to provide the insurance companies with the additional letters of credit they required. The insurance companies were already holding $12.7 million of letters of credit and after American Carriers acquired Smith's Transfer and increased the size of

the trucking operation, the insurance companies demanded more letters of credit.

Over Westinghouse's objection, Mr. Miller testified about statements made to him by Leon Robertson during their June 22, 1988, telephone conversation. Mr. Miller said he was told by Mr. Robertson that American Carriers had obtained financing and expected the loan from Westinghouse to close on July 11, the same day the insurance policies were scheduled to expire, and that American Carriers would then furnish additional letters of credit of $8.4 million to the insurance companies for a total of about $21 million in letters of credit. Mr. Robertson also informed Mr. Miller that the loan contingency requirement (commitment letter Condition 11) that Westinghouse approve American Carriers' May 1988 business operating results had already occurred and that Westinghouse would conduct a prefunding audit before closing, a repeat of the previous audit.

Frank Schockey, Regional Vice President of Westinghouse for the area that included the continental United States west of the Mississippi River during the time covered by American Carriers' allegations, testified at trial before Mr. Miller testified. He said that after the commitment letter was issued by Westinghouse and after the May performance results had been received by Westinghouse, but before June 21, 1988, Richard McDonald, Division Vice President of Westinghouse in charge of the Corporate Finance Division, determined that Westinghouse would not proceed with the loan because American Carriers had not satisfied its May 1988 performance projections. Mr. McDonald told Mr. Schockey that he would consider American Carriers' June performance results.

Mr. Schockey testified about the June 21 meeting between representatives of Westinghouse and American Carriers in American Carriers' office. He testified that he informed Leon Robertson at the meeting that "the May results were not accepted, and the loan could not go forward." He said that American Carriers was told Westinghouse would do nothing more on the loan. He testified about a memorandum that referenced the meeting which was drafted by Lee Mosby, Regional Manager for Westinghouse, who was also present at the June 21 meeting. Mr. Mosby wrote the memorandum to Mr. Schockey. The memorandum chronicled events that had occurred in the transaction between Westinghouse and American Carriers, including the June 21 meeting in Kansas City. Mr. Schockey saw the memorandum knowing it would be sent to Mr. McDonald. The memorandum stated that Mr. Schockey told American Carriers at the June 21 meeting that Westinghouse was willing to proceed with the loan but wanted American Carriers' best estimate of its June performance results. Mr. Schockey, in his trial testimony, denied saying that but acknowledged he did not correct the memorandum before it was sent to Mr. McDonald in Pennsylvania.

Mr. Robertson testified at trial, before Mr. Miller testified, about the June 21, 1988, meeting between American Carriers and Westinghouse. Mr. Robertson stated that on June 21, 1988, he met with representatives of Westinghouse in his office. During that conversation, he said he was told by the Westinghouse representatives that American Carriers' May operating results satisfied the requirements of commitment letter Condition No. 11 and that closing would proceed on July 11. Mr. Robertson said he was told by a Westinghouse representative at the meeting that Mr. Miller could speak to a named Westinghouse representative to confirm that Westinghouse was ready to proceed with closing. It is this testimony that Westinghouse claims was unfairly and improperly bolstered by Mr. Miller's testimony recounting Mr. Robertson's comments during their June 22 telephone conversation.

On June 22, 1988, Mr. Robertson sent a letter to Mr. Miller confirming that the closing was scheduled for "July, 11, 12, 1988," and that the regional vice president for Westinghouse would discuss Westinghouse's commitment with him. This letter was introduced as evidence.

■ Westinghouse cites Rule 801(d)(1)(B), Federal Rules of Evidence, as support for its contention that the trial court erroneously permitted Mr. Miller to relate Mr. Robertson's June 22 telephone conversation. Although extrajudicial oral or written

statements offered to prove the truth of the matter asserted have been traditionally classified as hearsay, the rule provides that a prior extrajudicial statement of a witness subject to cross-examination concerning the extra judicial statement that is "consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive," is not hearsay. Rule 801(d)(1)(B), Federal Rules of Evidence.

Although the federal circuits have split on the extent to which a prior consistent statement may be used,[5] the conflict does not extend to the requirement that before a party attempts to utilize a witness' prior consistent statement a prior statement inconsistent to the witness' trial testimony must have been asserted. The Eighth Circuit in *Dennis* stated:

> After one party opens the subject of prior inconsistent statements, the other party may wish to introduce prior consistent statements to rehabilitate the "turncoat" witness.... A prior consistent statement is admissible under Rule 801(d)(1)(B) to rebut a charge that the witness had an improper motive for testifying. (citation omitted). A request to introduce prior consistent statements is properly granted to the extent that they relate to the same subject matter as prior inconsistent statements used for impeachment. (citation omitted). A prior consistent statement may not be introduced, however, simply to bolster the testimony of the witness at trial.

*Id.* at 797.

■ Use of a witness' prior consistent statement at trial pursuant to Rule 801(d)(1)(B) Federal Rules of Evidence is not inconsistent with established Missouri case law. In Missouri, also, use of a trial witness' duplicitous or corroborative extrajudicial statement is restricted. *State v. McMillin*, 783 S.W.2d 82, 98 (Mo. banc 1990), cert. denied, 498 U.S. 881, 111 S.Ct. 225, 112

L.Ed.2d 179–80 (1990). The rule exists to prevent one party from obtaining unfair advantage of another by presenting "the same testimony in multiple forms." *State v. Seever*, 733 S.W.2d 438, 441 (Mo. banc 1987). A trial witness' prior consistent statement is properly recognized only after proof has established a prior statement inconsistent to the witness' trial statement and only when the prior consistent statement pertains to the specific subject on which the witness has been impeached. *State v. Morris*, 639 S.W.2d 589, 592 (Mo. banc 1982); *Broome v. Bi–State Dev. Agency*, 795 S.W.2d 514, 518 (Mo.App.1990). "Until a witness is impeached, admission of prior consistent statements is improper and self-serving." *Broome*, 795 S.W.2d at 518, quoting *State v. Earvin*, 539 S.W.2d 615, 616 (Mo.App.1976). In *Broome*, the Eastern District discussed the admissibility of prior consistent statements. The court stated that:

> when a witness is impeached by proof of an inconsistent statement, relevant evidence of the witness' prior statement consistent with his trial testimony is admissible for the purpose of rehabilitation. However, before this rule applies, "it is essential that the witness has been impeached *by proof* of his statements inconsistent with [his] present testimony."

*Broome*, 795 S.W.2d at 518, quoting *State v. Henderson*, 666 S.W.2d 882, 890 (Mo.App. 1984) (emphasis in original). In *Henderson*, the court said:

> Where a witness, who testifies at the trial, is asked on cross-examination whether he has previously made an inconsistent statement and he denies doing so, it is premature for the party sponsoring that witness to offer evidence of a prior consistent statement so long as there has not yet been proof of a prior inconsistent statement.

*Henderson*, 666 S.W.2d at 890–91. *See also State v. Robinson*, 782 S.W.2d 694, 697 (Mo. App.1989), citing *State v. Hanson*, 735 S.W.2d 100, 102 (Mo.App.1987) (the court

**5.** The *Eighth Circuit* has addressed the extent to which a prior consistent statement may be used at trial under Rule 801. In *U.S. v. Dennis*, 625 F.2d 782 (8th Cir.1980), the court limited admission of a prior consistent statement to "situations where the prior consistent statements have high probative value." *Id.* at 797. The court said that "[o]nce the witness admits making a prior consistent statement, no further testimony on the point is necessary." *Id.*

noted that "it is not only the impeachment of a witness by a prior inconsistent statement that renders an earlier statement consistent with his trial testimony," but "any evidence tending to permit the inference that the testimony of the witness is recently fabricated opens the door to the introduction of the statement consistent with the witness' testimony if made prior to the suggested fabrication.")

Mr. Miller testified to Mr. Robertson's June 22, 1988, telephone communication to him that Westinghouse had approved American Carriers' May 1988 operating results and had approved the loan. This testimony was consistent with Mr. Robertson's trial testimony. Mr. Robertson's statement to Mr. Miller about Westinghouse approving American Carriers' May operating results and the loan was a prior consistent statement to Mr. Robertson's trial testimony.

■ Although testimonial evidence was presented by Westinghouse that Mr. Schockey had not told Mr. Robertson that American Carriers' May operating results were approved as satisfaction of Condition No. 11, the conflicting testimony was a credibility issue for the jury to determine. Conflicting testimony is a common trial occurrence resolved by the trier of fact. Westinghouse had not proved, however, Mr. Robertson had made a prior inconsistent statement that impeached his trial testimony that Westinghouse approved American Carriers' May operating results and committed itself to make the loan. Therefore, the trial court erred in permitting, over Westinghouse's objection, Mr. Miller to testify to Mr. Robertson's June 22 statement to him that Westinghouse had approved American Carriers' May operating results and had committed to extend the loan.

■ The erroneous admission of evidence is reviewed for prejudice by appellate courts and reversed only if the error was so prejudicial that it deprived the appellant of a fair trial. *McMillin,* 783 S.W.2d at 98. In *State v. Ford,* 753 S.W.2d 5 (Mo.App.1988), this court recognized that the error in admitting an extra judicial statement consistent with a witness' trial testimony, without first proving the witness' prior inconsistent statement,

may not be prejudicial if the prior consistent statement is "cumulative to other testimony which was properly admitted and which fully proved the issue." *Id.* at 7. In *State v. Johnson,* 753 S.W.2d 576 (Mo.App.1988), a police officer was permitted to testify as to items the victim testified at trial were stolen from his home. *Id.* at 588. The appellant argued that the police officer's testimony permitted the state to "bolster" the victim's testimony about the stolen items. *Id.* The court said the sole issue was whether appellant was involved in the theft, not the items taken, and the verdict depended on whether the jury believed other stated witnesses. *Id.* The court determined, "Admission of objectionable hearsay evidence will not constitute reversible error if, as a matter of law, it can be concluded that such hearsay is merely cumulative to other evidence fully proving the issue." *Id.* In *State v. Barbee,* 822 S.W.2d 522 (Mo.App.1991), the court determined that "the admission of a witness' extrajudicial statement may amount to harmless error when the statement adds nothing substantial and the witness is available for cross-examination." *Id.* at 526. Because the court in *Barbee* found "no total repetition of the victim's testimony" had occurred, the erroneous introduction of the prior consistent statement was harmless. *Id.* In *State v. McMillin,* supra, the Supreme Court, in finding no resulting prejudice in the improperly admitted prior consistent statement stated:

> Error which may require reversal in a close case may be disregarded as harmless where evidence of guilt is strong. (Citation omitted). Assuming arguendo, that the testimony ... was improperly bolstered, evidence of McMillin's guilt was otherwise established by strong evidence.

*Id.* at 99. In *Broome,* 795 S.W.2d at 519, the Eastern District found the rehabilitating statement of a witness, offered through the plaintiff's son's trial testimony, that a traffic light was yellow was consistent with her trial testimony and was erroneous and prejudicial because the son's testimony, that his mother told him the light was yellow, was the only testimony corroborating the witness' trial testimony that the light was yellow when the bus involved in the vehicular accident result-

ing in the suit arrived at the intersection. *Id.* In *Stratton v. Kansas City, Missouri*, 337 S.W.2d 927 (Mo.1960), the plaintiff's prior consistent statement was offered through the direct examination of the insurance adjuster, to whom the plaintiff had made the statement the day of her fall. *Id.* at 930. The adjuster testified after the plaintiff testified. *Id.* The statement was, "At a broken place or raised place in the sidewalk I stumbled and fell to the right sideways on my right hip." *Id.* The Supreme Court classified the plaintiff's statement to the insurance adjuster as self-serving and inadmissible under any rule. *Id.* In determining whether the defendant had been prejudiced by the erroneous admission of the statement, the Court reviewed several cases. *Id.* at 932. Citing *Gough v. General Box Co.*, 302 S.W.2d 884 (Mo.1957) and *Wallendorf v. Rensing*, 329 S.W.2d 779 (Mo.1959), the Court in *Stratton* emphasized that in each of the two cases the improperly admitted self-serving statements concerned the principal fact issue in each case. *Id.* In *Gough*, the plaintiff's statement admitted that "a truck had jackknifed into him." *Stratton*, 337 S.W.2d at 932, citing *Gough*, 302 S.W.2d at 887. The *Stratton* Court quoting from *Gough* wrote:

> Whether defendant's truck jackknifed and crossed over into plaintiff's side of the highway, or whether plaintiff turned his truck to the left into the side of defendant's trailer was the principal fact issue of the case. Upon the determination by the jury of that question depended the result of the lawsuit.

*Id.* at 932. The Court in *Stratton* noted that in *Wallendorf*, the improperly admitted defendant's statement was that "the truck ahead of her car made a left turn right in front of her without giving any signal." *Id.* citing *Wallendorf*, 329 S.W.2d at 783. In *Stratton*, the Court recognized that "the principal fact issue was whether plaintiff stumbled over a raised place in the sidewalk or slipped on snow or ice." *Id.* Thus, in *Stratton*, *Wallendorf*, and *Gough*, when determining whether prejudice resulted from the improper introduction of self-serving statements, the courts were impacted by the fact that the statement considered in each

case concerned the principal issue in the case, resulting in prejudice and reversal.

■ Applying the rationale of the cases analyzed to Mr. Miller's improper testimony recounting Mr. Robertson's June 22 telephone statement that Westinghouse had approved American Carriers' May results and would make the loan is helpful. In *Barbee*, the court's recognition that a witness' extrajudicial statement may be harmless error "when the statement adds nothing substantial and the witness is available for cross-examination." *Barbee*, 822 S.W.2d at 526. *Barbee* is inappropriate in this case because the improperly admitted self-serving statement concerned what may be the principal fact issue in the case, whether Westinghouse acknowledged satisfaction of the conditions precedent to the loan at the June 21 meeting between American Carriers and Westinghouse and committed to make the loan. *Stratton*, 337 S.W.2d at 930.

Unlike *Broome*, where the improperly admitted rehabilitating statement of a witness, offered through the plaintiff's son's testimony about a crucial fact, the color of the traffic light when the vehicular accident occurred, was the only testimony corroborating the witness' trial testimony as to the color of the traffic light, *Broome*, 795 S.W.2d at 519, in this case, Mr. Miller's improperly admitted testimony relating Mr. Robertson's June 22 telephone comments about the June 21 meeting was not the only testimony corroborating Mr. Robertson's trial testimony on the subject. Mr. Glancy's trial testimony corroborated Mr. Robertson's trial testimony about Mr. Schockey's comments regarding Westinghouse's approval of American Carriers' May operating results and willingness to proceed with the loan. Mr. Glancy testified that Mr. Schockey said at the June 21 meeting, "Pittsburgh had given us the green light, and we were proceeding with closing on the deal." Mr. Mosby's July 10, 1988, memorandum to Mr. Schockey that chronicled events of the transaction, including the occurrences of the June 21 American Carriers/Westinghouse meeting, was reviewed by Mr. Schockey before it was sent as a memorandum to Mr. McDonald and incorporated a statement that Mr. Schockey had told American Carri-

ers at the June 21 meeting that Westinghouse was willing to proceed with the loan but wanted American Carriers' best estimate of its June performance results. This memorandum was introduced into evidence and discussed during Mr. Schockey's testimony. The letter sent by Mr. Robertson to Mr. Miller referencing their June 22 telephone conversation, enclosing a copy of the commitment letter agreement, and stating the closing date for the credit accommodation was July 11–12, 1988, was also introduced into evidence without objection. The two exhibits, with the trial testimony of Mr. Robertson and Mr. Glancy on the subject, "fully proved the issue" and reduced Mr. Miller's improper testimony about the June 22 telephone conversation between him and Mr. Robertson to cumulative evidence. *Ford*, 753 S.W.2d at 7. Considering the evidence and the case law on the subject, as a matter of law, Westinghouse was not deprived of a fair trial by the admission of Mr. Miller's improper testimony. Point (6) is denied.

### (7)

Westinghouse claims, as its next point on appeal, that the trial court erred in not permitting it to introduce evidence of claims, or to refer to claims, filed by American Freight in American Carriers' bankruptcy case. Westinghouse asserts that the proof of claim filed by American Freight in American Carriers' bankruptcy case, which professed that certain acts of American Carriers harmed American Freights' ability to conduct business, were admissions against interest and were properly admissible as evidence that Westinghouse did not cause American Carriers' bankruptcy.

During American Carriers' Chapter 11 bankruptcy reorganization proceedings, American Freight filed claims against American Carriers. The claims asserted that (1) American Carriers breached its fiduciary duty to American Freight and negligently caused the acquisition of Smith's Transfer; (2) certain of American Carriers actions contributed to or caused banks to demand the outstanding balance owed pursuant to a credit agreement and may have contributed to American Freight's inability to operate and

to American Freight's Chapter 11 bankruptcy filing; and (3) American Carriers' breach of its fiduciary duty owed to American Freight, and possibly negligent conduct, caused American Freight damage in an undetermined amount. Westinghouse claims error in the trial court's refusal to permit it to introduce these assertions. American Carriers responds, claiming the proofs of claim filed in the Chapter 11 bankruptcy proceedings were not relevant to the issues, were "unduly prejudicial," and were conclusory.

The admissibility of evidence is within the discretion of the trial court, and the standard of appellate review is whether the trial court abused its discretion. *Gant v. Hanks*, 614 S.W.2d 740, 744 (Mo.App.1981). The Supreme Court stated in *State ex. rel. Webster v. Lehndorff Geneva, Inc.*, 744 S.W.2d 801 (Mo. banc 1988), that:

[j]udicial discretion is abused when a trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration....

*Id.* at 804.

The damages experienced by American Carriers resulting from the breach of the Westinghouse commitment letter agreement was an issue at trial. "Evidence is relevant if it tends to prove or disprove a fact in issue." *Reed v. Rope*, 817 S.W.2d 503, 510 (Mo.App.1991). American Freight's claims that American Carriers caused or contributed to cause it to be unable to successfully operate its business and to file for Chapter 11 protection because American Carriers violated a fiduciary duty owed to American Freight were conclusory assertions filed in bankruptcy proceedings. Facts and circumstances relevant to the issues in a case are admissible unless their exclusion is required by an established rule of evidence. *McFadden v. McFadden*, 509 S.W.2d 795, 798 (Mo.App.1974). A party's factual admissions are admissible as admissions against the interest of that party, but a party's legal conclusions are not. *Coldwell Bankers–Gordon Co. Realtors v. Waters*, 791 S.W.2d 412, 415 (Mo.App.1990). "General allegations

that simply state that a plaintiff's damages were caused by some conduct on the part of defendant ... are legal conclusions, not admissions of fact and, as such are not admissible as admissions against interest." *Fahy v. Dresser Indust., Inc.,* 740 S.W.2d 635, 642 (Mo. banc 1987).

■ The claims filed by American Freight in American Carriers' bankruptcy were general allegations which asserted American Carriers caused American Freight damages. The assertions were legal conclusions and not admissible as statements against interest.[6] Therefore, the trial court did not abuse his discretion. Point (7) is denied.

#### (8)

Westinghouse's eighth point on appeal asserts that the trial court erred in permitting American Carriers, over objection, to introduce those portions of the Westinghouse Business Credit Procedures Manual pertaining to proposal letters and commitment letters, claiming that the portions of the manual introduced were not relevant to any material issue, contained inadmissible conclusions of law, their probative value was substantially outweighed by their prejudicial effect, and they misled and confused the jury. American Carriers retorts that to prove special damages, it was compelled to show that, when the agreement became binding, Westinghouse was reasonably cognizant of the damages American Carriers would probably experience when Westinghouse breached the agreement and did not extend the loan, *Kim v. Conway & Forty, Inc.,* 772 S.W.2d at 728, and that the portions of the manual introduced were relevant to the issue.

The following portions of the manual were introduced, read to the jury, and specifically quoted in Westinghouse's brief:

A proposal letter should only be issued if our preliminary screening/reviewing process indicates that the contemplated loan transaction can be closed following a more thorough review, executive credit committee approval, etc.... For example, substantial money damages may be claimed if the prospective borrower is not able to close a business transaction or continue in business as a result of our negligent actions.... Whereas a proposal establishes the basis for pursuing some kind of loan transaction, a commitment letter, by its nature, obligates the issuer to fund that loan transaction, subject to certain definitive conditions precedent to or of funding being fulfilled.... A commitment letter severely restricts the lender's ability to escape this obligation, or to subsequently alter terms, conditions, and/or provisions.... Consequently, we should only be willingly to commit Westinghouse after having performed the necessary due diligence, and after having obtained executive credit committee approval if required.... Having this understanding is crucial because wrongful disengagement from a contemplated loan transaction will meaningfully expose Westinghouse to claims of, or damages suffered by, either the prospective borrower.... Damages for losses suffered from Westinghouse's refusal to lend where another financial source was either not available or was not available on a timely basis.... One final point. In many instances it may be preferable to proceed on the basis of a verbal, rather than a written, commitment on the assumption that a written communication would unnecessarily expose WCC if a material dispute arises between the prospective borrower and WCC.

Additionally, during closing argument, counsel for American Carriers read the following portion of the manual:

... wrongful disengagement from a contemplated loan transaction will meaningfully expose WCC to claims of, or for damages suffered by, either the prospective borrower or an independent third party

---

6. Several issues not raised on appeal here would compel discussion if the claims asserted by American Freight in American Carriers' bankruptcy proceedings were admissible as admissions against interest. (E.g., whether American Freight's assertions would be admissible against it and American Carriers as American Freights' parent entity, or whether the "admissions," introduced as to American Freight only, would have prejudiced American Carriers despite a limiting instruction.)

... damages for losses suffered from WCC's refusal to lend where another financing source was either not available or was not available on a timely basis.

■ Evidence is relevant if the offered fact tends to prove or disprove a fact in issue or corroborates other relevant evidence. *Oldaker v. Peters*, 817 S.W.2d 245, 250 (Mo. banc 1991). The admissibility of evidence is within the discretion of the trial court. *Gant v. Hanks*, 614 S.W.2d at 744. The standard of review is whether the trial court abused its discretion. *Id.* "The trial court abuses its discretion when its ruling is clearly against the logic of the circumstances then before the trial court and is so unreasonable and arbitrary that the ruling shocks the sense of justice and indicates a lack of careful deliberate consideration." *Oldaker*, 817 S.W.2d at 250, quoting *Richardson v. Colonial Life & Accident Ins. Co.*, 723 S.W.2d 912, 915 (Mo. App.1987).

■ The portions of the Westinghouse Business Credit Procedures Manual introduced and read to the jury were relevant. The manual expressed Westinghouse's awareness of consequences one could reasonably anticipate if it wrongfully refused to extend a loan after its commitment letter was accepted. Evidence that Westinghouse was generally aware of potential damages to an applicant to whom it had committed a loan if Westinghouse failed to extend the loan as agreed was relevant to the issue of whether when Westinghouse entered the contract it foresaw the probable consequences to American Carriers if it failed to adhere to the loan commitment agreement.

Westinghouse argues that the manual constitutes legal conclusions and that legal conclusions cannot be introduced as admissions against interest. Westinghouse cites *Lazane v. Bean*, 782 S.W.2d 804 (Mo.App.1990), for the general proposition that while a party's statements of fact, such as those in an abandoned pleading, are admissible as admissions against interest, legal conclusions are not admissible as admissions against interest. *Id.* at 805.

Westinghouse also cites *Macheca v. Fowler*, 412 S.W.2d 462, 465 (Mo.1967), as authori-

ty for the rule that a party's legal conclusions cannot be introduced as an admission against interest. The court in *Macheca* held that allegations in plaintiff's petition regarding two dismissed defendants should have been excluded because they tended to confuse the issues and were not admissible as admissions against interest. *Id.* at 466. The court determined that the deleted portion of the petition that had been introduced should not have been admitted because it did not constitute an admission. *Id.* at 467. The court said:

> [T]he abandoned allegation did not contradict any testimony offered by plaintiff. The fact that he had previously asserted such a loss became immaterial when the claim was deleted from plaintiff's petition. Thereafter, there was nothing on that issue for contradiction and the injection of the deleted allegation could only have been for the purpose of providing a basis for the inflammatory and prejudicial argument of defendant.

*Id.*

In *Lazane* and *Macheca*, and in the other cases cited as support by Westinghouse, a party had introduced or attempted to introduce pleadings of the party opponent as admissions against interest. American Carriers in this case introduced portions of Westinghouse's procedures manual relating to commitment letters. The portions of the manual were not introduced as admissions against interest. They were not offered to prove that Westinghouse admitted fault or that Westinghouse admitted American Carriers sustained damages. The portions of the manual were offered as evidence that Westinghouse was aware damages could result to a loan applicant if Westinghouse breached a loan commitment agreement and that Westinghouse policy cautioned employees about potential consequences in committing to loans and failing to adhere to loan agreements.

Westinghouse also claims that introduction of the portions of the manual relating to commitment letters risked confusing, misleading, and prejudicing the jury. Westinghouse failed to state how the portions of the manual confused, misled or prejudiced the

jury. Additionally, the trial court admonished the jury that the portions of the manual introduced into evidence were not to be considered as stating the law to be applied in the case. The court instructed the jury as follows:

> Ladies and gentlemen of the jury, during the trial of this action, certain portions of the Westinghouse Procedure Manual covering commitment letters and proposal letters, have been introduced into evidence. The Court instructs the jury that nothing in the Westinghouse Procedures Manual shall be considered by you to state the law that is to be applied to the facts of this case. Issues of law are for the Court to decide. You are to decide the facts of this case in accordance with the instructions given to you.

The trial court did not abuse its discretion in permitting introduction of portions of the manual pertaining to the issue of foreseeability of damages. Point (8) is denied.

### (9)

Westinghouse claims as point (9) on appeal that it was denied a fair and impartial trial because a juror failed to respond during voir dire that he had been involved in litigation when the question was propounded to the venire whether any member of the panel had been a party to a lawsuit. The pertinent questions asked by counsel during voir dire are as follows:

> **Counsel for American Carriers:** Is there any member of the jury panel who has ever been a party to a lawsuit, that is where you have either filed a lawsuit against somebody or some company, and then, a plaintiff, like my clients, or where you have been sued and are a defendant, or were a defendant at any time?
>
> \*  \*  \*  \*  \*  \*
>
> Now, I'm not talking about just claims, I'm talking about lawsuits.
>
> \*  \*  \*  \*  \*  \*
>
> **Venire person:** Question. Did you say with a company or personally?
>
> **Counsel for American Carriers:** Either involving a person, a natural person, or a company, either one.

> Okay. Now, I'm talking about lawsuits where it's filed in a court. Doesn't necessarily have to be tried in the court, but it's filed in the court.
>
> I see a lot of hands out here.
>
> \*  \*  \*  \*  \*  \*
>
> I'll come back and do it row by row, if you don't mind.
>
> \*  \*  \*  \*  \*  \*

> **Counsel for American Carriers:** Is there anybody up here who has ever been a party to a lawsuit, either as a plaintiff or a defendant?

Juror Douglas Gossey did not respond to the questions inquiring about each venire member's involvement in litigation as a party. Mr. Gossey, as a member of the jury, signed the verdict form awarding American Carriers the verdict.

After the trial in this case, Westinghouse learned that Mr. Gossey and his wife had been parties plaintiff in a suit pending in 1990. Westinghouse filed a motion for a new trial alleging that it was prejudiced by Mr. Gossey's failure to respond to inquiry during voir dire that he had been a plaintiff in a law suit. The trial court conducted a hearing and heard evidence on the motion. The evidence during the hearing revealed that the vehicle in which the Gosseys were riding was struck by another vehicle. After the accident, the Gosseys returned home and Mrs. Gossey continued to experience discomfort in an arm. Within two hours after the accident, Mr. Gossey drove his wife to a hospital in the vehicle he was driving when the accident occurred. The Gosseys learned at the hospital that Mrs. Gossey had sustained a simple fracture to her arm, and her arm was placed in a sling. Mrs. Gossey sought recovery in a law suit for personal injury alleged to have resulted from the 1988 automobile accident. Mr. Gossey's claims included incurred medical expenses and loss of consortium. The case was resolved prior to trial, and both Mr. and Mrs. Gossey signed appropriate documents settling the case.

Mr. Gossey testified during the post trial hearing. He stated that he had forgotten

about the suit in which he and his wife had filed a petition when inquiry was made during voir dire. The trial court found that Mr. Gossey unintentionally failed to disclose during voir dire that he had been a plaintiff in a lawsuit and that Westinghouse was not prejudiced by the nondisclosure.

Litigants are entitled to a fair and impartial trial before a jury of twelve qualified jurors. *Williams v. Barnes Hosp.*, 736 S.W.2d 33, 36 (Mo. banc 1987). Litigants "are entitled to unbiased jurors whose experiences ... will not prejudice the resolution of the case." *Id.* To facilitate litigants determining the qualifications of a venireman to serve as a juror and to challenging intelligently a venireman's competence to serve as a juror in their case, veniremen have a duty to answer all questions propounded during voir dire fully, fairly and truthfully. *Id.*

*Williams* is the definitive case on the failure of a venireman to disclose information when asked a question during voir dire. The Supreme Court in *Williams* discussed both intentional and unintentional nondisclosure of information requested during voir dire. *Id.* The Court defined intentional nondisclosure by a potential juror to exist "(1) where there exists no reasonable inability to comprehend the information solicited by the question asked of the prospective juror, and (2) where it develops that the prospective juror actually remembers the experience or that it was of such significance that his purported forgetfulness is unreasonable." *Id.* The Court recognized unintentional nondisclosure to exist where, "for example, the experience forgotten was insignificant or remote in time, (citation omitted) or where the venireman reasonably misunderstands the question." *Id.* Whether nondisclosure is intentional or unintentional, undisclosed material information sought from a venireman during voir dire deprives the litigants of intelligent and meaningful exercise of challenges for cause or peremptory challenges. *Id.* Intentionally withholding material information requested during voir dire infers that the venireman is biased and prejudiced. *Id.* at 37. Unintentional nondisclosure, because it is not the result of design, does not infer bias and prejudice. Therefore,

unintentional nondisclosure may not require a new trial. *Id.*

> [W]here nondisclosure is found to be both unintentional and reasonable, the relevant inquiry becomes whether, under the circumstances, the juror's presence on the jury did or may have influenced the verdict so as to prejudice the party seeking a new trial.

*Id.* Whether nondisclosure is intentional or unintentional is within the sound discretion of the trial court, and the trial court's ruling will not be disturbed on appeal absent a showing that the trial court's discretion was abused. *Id.* at 36. Factors the trial court considers include materiality and relevance of the undisclosed fact. *Alexander v. F.W. Woolworth Co.*, 788 S.W.2d 763, 766 (Mo.App. 1990). The credibility of the juror's subsequent explanation for failing to disclose is also important, and the trial court is uniquely able to observe the juror's response to inquiry. *Id.* at 768.

The trial court's determination of whether the party seeking a new trial has been prejudiced by the unintentional nondisclosure of a juror will not be disturbed on appeal unless the trial court abused its discretion. *Williams*, 736 S.W.2d at 37. The trial court will be found to have abused its discretion in finding a lack of prejudice from a juror's voir dire nondisclosure "[o]nly when the appellate court is convinced from a totality of the circumstances that a [litigant's] right to a fair trial and the integrity of the jury process have been impaired." *Anglim v. Missouri Pac. Ry. Co*, 832 S.W.2d 298, 306 (Mo. banc 1992).

Westinghouse cites *Gillespie v. Goedecke*, 782 S.W.2d 467 (Mo.App.1990), in support of its claim that the trial court's findings that Mr. Gossey's nondisclosure was unintentional and not prejudicial were an abuse of its discretion. In *Gillespie*, this court found that the trial court had abused its discretion in finding a juror's nondisclosure during voir dire that she had prosecuted a civil lawsuit for the rape she had endured had been unintentional nondisclosure. *Id.* at 469. In determining that the juror in *Gillespie* had remembered the suit in which she had been plaintiff and had intentionally not disclosed

the lawsuit during voir dire, this court noted that the rape had occurred eight years before the voir dire inquiry; rape constitutes an extremely traumatic experience, not easily forgotten; the juror had experienced counseling as a result of the rape; the juror remembered the rape, the lawsuit and the name of her attorney at the post trial hearing in the case in which she served as juror; the law suit was settled for over $23,000; and the suit was concluded just four years prior to the voir dire. *Id.* at 468–69. Judge Turnage wrote that the facts presented unduly taxed the court's credulity to believe that the juror did not remember the rape and subsequent lawsuit. *Id.* at 468.

■ In this case the facts do not tax the court's credulity to believe that Mr. Gossey failed to remember the law suit filed as a result of his wife's injured arm sustained in an automobile accident in 1988. Mr. Gossey's claim was for loss of consortium and for medical expenses incurred for treatment of his wife's injuries. He was not injured in the accident, and he drove his vehicle immediately after the accident. He was not deposed, and interrogatories were not propounded to him. The suit was settled the same year that it was filed. The facts presented at the after trial hearing are not comparable to the facts presented in *Gillespie.* The trial court's finding that Mr. Gossey unintentionally failed to disclose that he had been a plaintiff in a lawsuit was not an abuse of discretion. Neither is this court convinced from the totality of the circumstances that Westinghouse's right to a fair trial and the integrity of the jury process were impaired. Thus, the trial court did not abuse its discretion in finding a lack of prejudice from Mr. Gossey's nondisclosure. Point (9) is denied.

The judgment is affirmed.

All concur.